## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| SHEILA GLUESING, *individually and on behalf of others similarly situated*, <br><br> Plaintiff, <br><br> v. <br><br> PRUDENTRX LLC and CAREMARK RX, L.L.C., <br><br> Defendants. | CA. No. 1:24-cv-00549-JJM-AEM |

## ORDER REGARDING PRODUCTION OF ELECTRONICALLY STORED INFORMATION AND PAPER DOCUMENTS

This Order Regarding Production of Electronically Stored Information and Paper Documents ("ESI Protocol") shall govern the Parties in the above-captioned case whether they currently are involved or become so in the future, and any related actions that may later be consolidated with this case (collectively, the "Litigation"). The ESI Protocol shall not apply in any other proceedings, including but not limited to any arbitration proceedings that may be initiated between the Parties.

Plaintiff proposes that there should be a validation protocol in this case to govern where parties use search terms or TAR, CAL, or other similar technology. The Parties agree, however, that during the initial period of discovery called for by the Court's June 17, 2025 Order (ECF No. 38), that the Parties will postpone any discussion of such a validation protocol. In addition, the Parties agree to postpone discussion and negotiation of procedures and protocols relating to the collection and/or production of custodial contacts, enterprise messaging, and social media data during the initial period of discovery called for by the Court's June 17, 2025 Order (ECF No. 38), and in the event such data is relevant and to be produced during this initial period, the Parties will meet and confer in good faith thereon.

I.   **GENERAL PROVISIONS**

   A.   **Applicability:** This ESI Protocol will govern the production of Electronically Stored Information ("ESI") and paper documents. To the extent that a Party collected and processed documents prior to the entry of this ESI Protocol, and production of such documents cannot be made in accordance with the terms of this ESI Protocol, the Parties shall meet and confer concerning the potential formats of the production of any such documents.

B.    **Cooperation:** The Parties agree that they will adhere to the principles of cooperation, transparency, reasonableness, and proportionality, as set forth in the Federal Rules of Civil Procedure and as interpreted by federal case law, as they conduct discovery in the Litigation.

C.    **Limitations & Non-Waiver:** Nothing in this ESI Protocol shall be construed to affect the admissibility of discoverable information. All objections to the admissibility of any documents are preserved and may be asserted at any time. Pursuant to the terms of this ESI Protocol, information regarding search process and ESI practices may be disclosed, but compliance with this ESI Protocol does not constitute a waiver, by any Party, of any objection to the production of particular ESI for any reason, including as irrelevant, undiscoverable, or otherwise inadmissible, unduly burdensome, or not reasonably accessible, or privileged, nor does it constitute a waiver of any right to discovery by any Party. For the avoidance of doubt, a Party's compliance with this ESI Protocol will not be interpreted to require disclosure of information potentially protected by the attorney-client privilege, the work product doctrine, the common-interest and joint-defense privileges, or any other applicable privilege. All Parties preserve all such privileges and protections, and all Parties reserve the right to object to any such privileges and protections.

D.    **ESI Liaisons:**

    1.    **Designation:** Plaintiff designates Stephen Teti as its ESI Liaison. Defendant PrudentRx designates Luke Dalton as its ESI Liaison. Defendant Caremark designates Anne-Louise Mittal as its ESI Liaison. Any Party is free to change its designated ESI Liaison by providing written notice to the other Parties.

    2.    **Duties of ESI Liaison:** Each ESI Liaison will be prepared to participate in the resolution of any e-discovery disputes or ESI issues that may arise (or designate another person as primarily responsible) and have access to personnel most knowledgeable about the Party's electronic systems and capabilities to, as appropriate, answer pertinent questions.

    3.    **Time Frame for ESI Issue Resolution:** Each ESI Liaison will acknowledge receipt of an ESI-related inquiry from another ESI Liaison within 2 business days after the initial inquiry and respond substantively no later than 5 business days after the initial inquiry. If the responding ESI Liaison believes the ESI issue in question is particularly complex and requires more than 5 business days to respond substantively, then within 5 business days the responding ESI Liaison will provide a general explanation of the process necessary to answer the question and provide an estimated response date.

E.    **Deadlines:** References to schedules and deadlines in this ESI Protocol shall comply with Fed. R. Civ. P. 6 with respect to computing deadlines.

F.    **Definitions:**

    1.    Plaintiff and Defendants, as well as their officers, directors, employees, agents, and legal counsel, are referred to as the "Parties" solely for the purposes of this ESI

Protocol. A single Plaintiff or Defendant, as well as, where applicable, its respective officers, directors, employees, agents, and legal counsel, may also be referred to as a "Party" solely for the purposes of this ESI Protocol.

2.    "Plaintiff" as used herein shall mean Plaintiff as set forth in the Class Action Complaint (ECF No. 1) or as amended, including in any subsequent complaint.

3.    "Defendants" as used herein shall mean Defendants named in the Class Action Complaint (ECF No. 1), or as amended, including in in any subsequent complaint.

4.    "Discovery Material" is defined as all information produced, given, or exchanged by and among all Parties, or received from non-Parties, in the Litigation, including all deposition testimony, testimony given at hearings or other proceedings, interrogatory answers, documents, and all other discovery-related materials, whether produced informally or in response to requests for discovery.

5.    "ESI" as used herein means "electronically stored information" and shall have the same meaning as defined under the Federal Rules of Civil Procedure.

6.    "Metadata" means and refers to data providing information about data, and includes without limitation: (i) information embedded in or associated with a native file that is not ordinarily viewable or printable from the application that generated, edited, or modified such native file which describes the characteristics, origins, usage and/or validity of the electronic file and/or (ii) information generated automatically by the operation of a computer or other information technology system when a native file is created, modified, transmitted, deleted, or otherwise manipulated by a user of such system.

7.    To avoid misunderstandings about terms, all Parties should consult the most current edition of The Sedona Conference Glossary.

G.    **Authenticity and Admissibility:** Nothing in this ESI Protocol shall be construed to affect the authenticity or admissibility of any document or data. All objections to the authenticity or admissibility of any document or data are preserved and may be asserted at any time.

H.    **Confidential Information:** For the avoidance of doubt, nothing herein shall contradict the Parties' rights and obligations with respect to any information designated as confidential under the Protective Order entered in this case.

I.    **Preservation:** The Parties agree that they shall continue to take reasonable steps to preserve relevant documents and ESI in accordance with their obligations under applicable law. The Parties will meet and confer, if necessary, regarding the scope of preservation, including custodians, data sources, date ranges, backups and/or archives, and categories of information that have been or should be preserved in connection with this Litigation and disclosures regarding custodians, data sources, date ranges, backups and/or archives, and categories of information necessary to facilitate the Parties' negotiations. By preserving or producing information for the purpose of this Litigation, the Parties are not conceding that such material is discoverable or admissible.

J.    **Encryption**: To maximize the security of information in transit, any media on which documents are produced may be encrypted by the producing Party. In such cases, the producing Party shall transmit the encryption key or password to the requesting Party, under separate cover, contemporaneously with sending the encrypted media.

## II.   GENERAL PRODUCTION FORMAT PROTOCOLS

A.    **TIFFs:** Except for structured data, all production images will be provided as a black-and-white, single-page Group IV TIFF of at least 300 DPI resolution with corresponding multi-page text and necessary load files. Each image will have a file name that is the unique Bates number of that image, pursuant to ¶ II(E). Original document orientation should be maintained to the extent reasonably practicable, not unduly burdensome, and technologically possible for a producing Party's vendor (*i.e.*, portrait to portrait and landscape to landscape). The imaged Data shall retain all attributes of the native or hard-copy file, such as document breaks. To the extent reasonably practicable, produced TIFF images will show all text and images that are visible in the form in which the electronic document was last saved, with the exception of redacted portions. Hidden content, tracked changes or edits, comments, notes, and other similar information, to the extent viewable within a document in its native file format shall also be imaged so that such content is viewable on the image file. Documents that are difficult to render in TIFF because of technical issues, or any other documents that are impracticable to render in TIFF format, may be produced in their native format with a placeholder TIFF image stating "Document Produced Natively" (or substantially similar language), or in the alternative, if applicable, "Exception File Unable to Be Imaged" (or substantially similar language). A producing Party retains the option to produce ESI in alternative formats if so agreed by the requesting Party, which may include native format, or a combination of native and TIFF formats.

B.    **Text Files:** Each ESI item produced under this ESI Protocol shall be accompanied by a text file as set out below. All text files shall be provided as a single document level text file for each item, not one text file per page. Each text file shall be named to use the Bates number of the first page of the corresponding production item.

1.    **OCR:** A producing Party may make paper documents available for inspection and copying/scanning in accordance with Fed. R. Civ. P. 34 or, additionally or alternatively, scan and OCR paper documents. Where OCR is used, the Parties will endeavor to generate accurate OCR and will utilize OCR processes and technology of sufficient quality to enable the generation of utilizable text files. OCR text files should indicate page breaks where possible and not unduly burdensome. Even if OCR is used by a producing Party, however, the Parties acknowledge that, due to poor quality of the originals, not all documents lend themselves to the generation of accurate OCR.

2.    **ESI:** Except for redacted documents, emails and other ESI will be accompanied by extracted text taken from the electronic file itself, where available.

3.    **Redacted documents:** For redacted documents, the Parties shall provide the full OCR text for the redacted version.

C.  **Production of Native Items:** The Parties agree that ESI shall be produced as TIFF images consistent with the format described in ¶ II(A) with an accompanying load file, which will contain, among other data points, the ESI data points listed in Appendix 1 hereto. The exception to this rule shall be spreadsheet-application files (*e.g.*, MS Excel), presentation files (*e.g.*, MS PowerPoint), personal databases (*e.g.*, MS Access), and multimedia audio/visual files such as voice and video recordings (*e.g.*, .wav, .mpeg, .mp3, .mp4, and .avi), and any non-standard file types that are not easily rendered to image for which all ESI items shall be produced in native format. In the case of personal database (*e.g.*, MS Access) files containing confidential or privileged information, the Parties shall meet and confer to determine the appropriate form of production. When producing the above file types in native format, the producing Party shall produce a single-page TIFF slip sheet indicating that a native item was produced. The filename must retain the file extension corresponding to the original native format; for example, an Excel 2003 spreadsheet's extension must be .xls. The corresponding load file shall include NativeFileLink information for each native file that is produced. The Parties agree to meet and confer to the extent that there is data in database application files, such as SQL and SAP, to determine a reasonable form of production of usable data. Through the pendency of the Litigation, the producing Party shall exercise reasonable, good faith efforts to maintain all preserved and produced native files in a manner that does not materially alter or modify the file or the metadata.

D.  **Requests for Other Native Files:** Other than as specifically set forth above, a producing Party need not produce documents in native format. If a Party would like a particular document produced in native format and this ESI Protocol does not require the production of that document in its native format, the Party making such a request shall explain the reason for its request that the document be produced in its native format. The requesting Party will provide a specific Bates range for documents it wishes to be produced in native format. Any native files that are produced should be produced with a link in the NativeLink field, along with all extracted text and applicable metadata fields set forth in Appendix 1.

E.  **Bates Numbering:**

   1.  All images must be assigned a Bates number that must always: (1) be unique across the entire document production; (2) maintain a constant prefix and length (0-padded) across the entire production; (3) be sequential within a given document; and (4) identify the producing Party. To the extent reasonably practicable, the Bates number must also maintain consistent numbering across a family of documents.

   2.  If a Bates number or set of Bates numbers is skipped in a production, the producing Party will so note in a cover letter or production log accompanying the production.

   3.  Producing Parties will brand all TIFF images at a location that does not obliterate or obscure any part of the underlying images to the extent reasonably practicable.

F.  **Parent-Child Relationships:** Parent-child relationships (the association between an attachment and its parent document) that have been maintained in the ordinary course of business should be preserved to the extent reasonably practicable. For example, if a Party

is producing a hard copy printout of an email with its attachments, the attachments should be processed in order behind the e-mail to the extent reasonably practicable.

G.  **Entire Document Families:** Subject to ¶¶ II(L)(1) & (L)(2) below, entire Document families must be produced, even if only the parent email or an attachment to an email is responsive, excepting (1) junk files and non-user-created content routinely excluded during processing (provided such routine processing-generated exclusions are agreed to among the parties), and (2) documents that are withheld on the basis of privilege and in compliance with the parties' stipulation or the Court's order on such assertions of privilege. Where a document is fully withheld from an otherwise produced family on the basis of privilege, the producing Party may produce a single-page TIFF slip sheet indicating that the document was withheld. The corresponding load file record for such a document only needs to provide information for the following fields: BegBates, EndBates, BegAttach, EndAttach, Withheld Placeholder, and Privilege Asserted.

H.  **Load Files:** All production volumes will be provided with two load files: an image cross-reference Opticon-compatible load file (usually called a .opt file) and a Concordance-delimited .dat file that will provide the document-level metadata fields identified in Appendix 1 below (to the extent available). The .opt file must reference each TIFF file in the corresponding production. The total number of documents referenced in a production's .dat file should match the total number of designated document breaks in the .opt files in the production.

I.  **Foreign Language Documents:** To the extent that documents or ESI are produced that contain languages other than English, in whole or in part, the Producing Party shall produce all foreign language documents and ESI in the original language. The Producing Party has no obligation to provide a translation of the documents or ESI or any portion thereof when producing a document or ESI in response to a request for production pursuant to Fed. R. Civ. P. 34.

J.  **Color:** Documents or ESI containing color need not be produced initially in color. However, if an original document or ESI item contains color markings and it is necessary to see those markings in their original color to understand the meaning or content of the document, then the requesting Party may, in good faith, request that the document or ESI item be produced in its original colors. For such documents, the requesting Party shall provide a list of Bates numbers of the imaged documents sought to be produced in color. The production of documents and/or ESI in color shall be made in single-page JPEG format (300 DPI). All requirements for productions stated in this ESI Protocol regarding productions in TIFF format apply to any productions of documents and/or ESI in color made in such an alternative format. Requests that a document be produced in color for the reasons set forth in this Paragraph will not be unreasonably denied by the producing Party. If a producing Party wishes to object, it may do so by responding in writing and setting forth its objection(s) to the production of the requested document in color.

K.  **Confidentiality Designations:** If a particular paper document or ESI item qualifies for confidential treatment pursuant to any applicable federal, state, or common law (*e.g.*, Personally Identifiable Information or Protected Health Information), or to the terms of the

Protective Order entered by the Court in the Litigation or a confidentiality stipulation agreed to by the Parties, the designation shall be branded on the document's image at a location that does not obliterate or obscure any part of the underlying images to the extent reasonably practicable. This designation also should be included in the appropriate data field in the load file. For documents produced in native format with image placeholders, the placeholder image for the native file should be branded with the appropriate confidentiality designation to the extent possible, or otherwise identified in compliance with the Protective Order. The Parties shall ensure that the confidentiality claim follows the document regardless of whether the designation imprints on the file when viewed in printed form. Failure to comply with the procedures set forth in this ESI Protocol, any protective order or confidentiality order, or any confidential stipulation shall not waive any protection or confidential treatment.

L.     **Redactions**

    1.     **Personal Data Redactions:** A producing Party may redact personal information to the extent that the information is not responsive to the requesting Party's request and falls within one of the following categories. In the event a producing Party produces materials containing personal data redactions in a format that a receiving Party believes has legibility or accessibility issues, the Parties shall meet and confer in good faith in an attempt to resolve the issue.

        a.     the information relates to medical or health issues of an individual; or

        b.     social security numbers, financial-account numbers or bank account information, taxpayer-identification numbers, driver's license numbers, birthdates, driver's license numbers, passport numbers, names of minor children, credit card information, or personal passcodes. Such redactions should be identified as "Redacted – Personal Data" on the face of the document.

    2.     **No "relevancy" redactions:** Unless otherwise agreed by the parties, a party may not make redactions based on an assertion the data is not relevant. The only redactions permitted are on the basis of privilege or the two specific categories of privacy listed above.

M.     **Production Media & Protocol:** A producing Party may produce documents via readily accessible computer or electronic media, including CD-ROM, DVD, or external hard drive (with standard PC compatible interface) ("Production Media"), or via file-sharing service, including any network-based secure file transfer mechanism or SFTP. Any requesting Party that is unable to resolve any technical issues with the electronic production method used for a particular production may request that a producing Party provide a copy of that production using Production Media.

To the extent practical, each piece of Production Media will be assigned a production number or other unique identifying label corresponding to the date of the production of

documents on the Production Media, as well as the sequence of the material in that production. For example, if the production comprises document images on three DVDs, the producing Party may label each DVD in the following manner: "[PARTY] Production January 1, 2025-001," "[PARTY] Production January 1, 2025-002," and "[PARTY] Production January 1, 2025-003." Where the Production Media used is a CD-ROM, DVD, external hard drive (with standard PC compatible interface), or USB drive, such production media must be sent no slower than overnight delivery via FedEx, UPS, or USPS. Each item of Production Media (or in the case of productions made via FTP link, each production transmittal letter) shall include: (1) text referencing that it was produced in the Litigation, (2) the production date, (3) the Bates number range of the materials contained on such production media item, and (4) a short description of the production. Any replacement Production Media will cross-reference the original Production Media and clearly identify that it is a replacement and cross-reference the Bates number range that is being replaced. Each Party shall designate an appropriate physical address to receive productions that are produced on Production Media.

Each production should include a transmittal letter that includes (1) the production date, and (2) the Bates range of the materials included in the production.

N.   **Resolution of Production Issues:** Documents that cannot be read because of imaging or formatting problems shall be identified by the Receiving Party to the Producing Party promptly after the Receiving Party's discovery of the issue. The Producing Party and the Receiving Party shall meet and confer to attempt to resolve problem(s), to the extent the problem(s) are within the Parties' control.

However produced, a producing Party shall provide clear instructions for accessing the production, including any necessary passwords or encryption keys.

## III. PAPER DOCUMENT PRODUCTION PROTOCOLS

A.   **Scanning:** A producing Party may make documents available for inspection or may scan and OCR any paper documents. Where OCR is used, the Parties agree that the following ¶¶ III(B)-(C) shall apply.

B.   **Coding Fields:** To the extent practical, the following information shall be produced in the load file accompanying production of any scanned paper documents: (a) BegBates, (b) EndBates, (c) BegAttach, (d) EndAttach, (e) Custodian (if determinable), (f) Confidentiality, (g) Pages, and (h) Redacted (Y/N) or otherwise indicating that a redaction is present. Additionally, all paper documents will be produced with a coding field named "Paper Document" marked with a "Y" or otherwise indicate that the document originated in paper, and such indication shall be explained to the requesting party.

C.   **Unitization of Scanned Paper Documents:** Paper documents should be logically unitized for production to the extent reasonably practicable. Generally, when scanning paper documents for production, distinct documents shall not be merged into a single record and single documents shall not be split into multiple records. The Parties will make reasonable efforts to unitize documents correctly.

1. **Relationship:** The relationship among the documents in a folder or other grouping should be reflected in proper coding of the beginning and ending document and attachment fields to the extent reasonably practicable.

2. **Identification:** Where a document, or a document group – such as folder, clipped bundle, or binder – has an identification spine or other label, the information on the label shall be scanned and produced as the first page of the document or grouping.

3. **Fixed Notes:** Paper Documents that contain fixed notes shall be scanned with the notes affixed, if it can be done so in a manner so as not to obstruct other content on the document. If the content of the Document is obscured by the affixed notes, the Document and note shall be scanned separately, and produced in a way that makes clear which page the note was affixed to.

4. **Custodian Identification**: The Parties will utilize best efforts to ensure that paper records for a particular Document Custodian are produced in consecutive stamp order.

## IV. ESI METADATA FORMAT AND PROCESSING ISSUES

A. **System Files:** ESI productions may be de-NISTed using the industry standard list of such files maintained in the National Software Reference Library by the National Institute of Standards & Technology as it exists at the time of de-NISTing. Other file types may be added to the list of excluded files if they clearly do not have user-created content and by agreement of the Parties.

B. **Metadata Fields and Processing:**

1. **Date and Time:** No party shall modify the date or time as contained in any original ESI.

2. **Time Zone:** To the extent reasonably practicable, each party shall process ESI items using a consistent time zone both in the metadata and on the image of the document. For the avoidance of doubt, ESI items that have already been previously processed in a different time zone need not be reprocessed, though the time zone previously used shall be reflected in the metadata. Each producing party will provide notice to the other party's ESI Liaisons of the time zone used in their produced metadata and on the image of produced documents.

3. **Auto Date/Time Stamps:** To the extent reasonably practicable, ESI items shall be processed so as to preserve the date/time shown in the document as it was last saved, not the date of collection or processing.

4. **Metadata Fields:** Except as otherwise set forth in this ESI Protocol, ESI files shall be produced with at least each of the data fields set forth in Appendix 1 that are available and can reasonably be extracted from a document.

The Parties are not obligated to manually populate any of the fields in the Appendix if such fields cannot reasonably be extracted from the document using an automated process, with the exception of the following fields: (a) BegBates, (b) EndBates, (c) BegAttach, (d) EndAttach, (e) Custodian/Custodians All/Other, (f) Confidentiality, (g) Redacted (Y/N), and (h) NativeLink fields, which should be delivered regardless of whether the fields can be populated pursuant to an automated process.

C.    **Redaction:**

1.    The Parties agree that, where ESI items need to be produced according to Appendix 1 and also must be redacted, they shall be produced in TIFF format with each redaction clearly indicated, except in the case of personal database files (*e.g.*, MS Access), which shall be governed by ¶ II(C), *supra*. To the extent practical, the producing Party must also produce a text file of such documents. Any metadata fields reasonably available and unnecessary to protect the privilege protected by the redaction, including but not limited to the metadata fields listed in the Appendix, shall be provided. The Parties understand that for certain MS Excel documents or other file types or files, TIFF redactions may be impracticable. These documents may be redacted in native format.

2.    If the items redacted and partially withheld from production are Excel-type spreadsheets as addressed in ¶ II(C), *supra*, and the native items are also withheld, to the extent reasonably practicable, each entire ESI item must be produced in TIFF format, including all unprivileged pages, hidden fields, and other information that does not print when opened as last saved by the custodian or end-user to the extent this content can be reasonably extracted from the file and/or imaged. For PowerPoint-type presentation decks, this shall include, but is not limited to, any speaker notes. For Excel-type spreadsheets, this shall include, but is not limited to, hidden rows and columns, all cell values, annotations, and notes. The producing Party shall also make reasonable efforts to ensure that any spreadsheets produced only as TIFF images are formatted so as to be legible. For example, column widths should be formatted so that the numbers in the column will display rather than "##########."

3.    If the items redacted and partially withheld from production are audio/visual files, the producing Party shall, to the extent reasonably practicable, provide the unredacted portions of the content. If the content is a voice recording, the Parties shall meet and confer to discuss the appropriate manner for the producing Party to produce the unredacted portion of the content.

D.    **Email Collection and Processing:**

1.    **Email Threading:** The Parties may use email thread suppression to avoid review and production of information contained within an existing email thread in another document being reviewed and produced, but under no circumstances will email thread suppression eliminate (a) the ability of a requesting Party to identify every

custodian who had a copy of a produced document or email within their accessible ESI data at the time of processing, or (b) remove from a production any unique responsive branches and/or attachments contained within an email thread.

2.     **Email Domains:** Producing Parties may utilize an ESI search process to identify categories of documents, such as emails from domains typically associated with junk email, such as fantasy football-related emails, retailer advertising, and newsletters or alerts from non-industry sources. To the extent a Party opts to exclude uniquely identifiable email domain names (*e.g.*, emails from domains typically associated with junk or irrelevant topics like sports, fantasy team competitions, retailer advertising, and newsletters or alerts from non-industry sources) as part of its initial filter of potentially responsive documents, the Parties agree to disclose domain names excluded under this paragraph.

E.     **De-duplication:** A producing Party may de-duplicate any file globally (*i.e.*, across Document Custodians) at the "family" level (i.e., families should not be broken due to de-duplication). The producing Party will make a reasonable effort to identify all custodians who were in possession of any de-duplicated documents through an appropriate load file field such as DuplicateCustodian or CustodianAll/Other (as noted in the Appendix). Additionally, all BCC recipients whose names would have been included in the BCC metadata field, to the extent such metadata exists, but are excluded because of horizontal/global de-duplication, must be identified in the BCC metadata field specified in the Appendix to the extent such metadata exists. In the event of rolling productions of documents or ESI items, the producing Party will, as needed, supplement the load files with updated duplicate custodian information, as well as BCC information to the extent such metadata exists. Duplicate custodian information may be provided by a metadata "overlay" and will be provided by a producing Party no later than 7 days after that Party has substantially completed its production of ESI.

1.     Duplicate electronic documents shall be identified by utilizing the industry-standard process of comparison of auto-generated hash values (*e.g.*, MD5 or SHA-1). All electronic documents bearing an identical value will be considered duplicative. The producing Party shall use reasonable efforts to produce only one document image or native file for duplicate ESI documents within the duplicate group to the extent practicable. The producing Party is not obligated to extract, review, or produce entirely duplicate ESI documents. Any other methodology for identification of duplicates, including email field selection for hash value creation, must be discussed with the requesting Party and approved in writing before implementation. The requesting Party will not unreasonably withhold approval.

2.     Duplicate emails and email families shall be identified by utilizing industry-standard methods that compare hash values created from selected fields. Duplicate identification will be identified at a family level, including message and all attachments. Email families bearing an identical value are considered a duplicate group. The producing Party shall use reasonable efforts to produce only one document image or native file for duplicate emails within the duplicate group to the extent practicable.

F.   **Zero-byte Files:** The Parties may, but are not required to, filter out stand-alone files identified as zero-bytes in size that do not contain responsive file links or file names. If the requesting Party in good faith believes that a zero-byte file was withheld from production and contains information responsive to a request for production, the requesting Party may request that the producing Party produce the zero-byte file. The requesting Party may provide a Bates number to the producing Party of any document that suggests a zero-byte file was withheld from production and contains information responsive to a request for production.

G.   **Microsoft "Auto" Feature:** To the extent reasonably practicable and technologically possible for a producing Party's vendor, Microsoft Excel (.xls) and Microsoft PowerPoint (.ppt) documents should be analyzed for the "auto" features, where documents have an automatically updated date and time in the document, file names, file paths, or similar information that when processed would be inaccurate for how the document was used in the ordinary course of business. If "auto date," "auto file name," "auto file path," or similar features are identified, the produced document shall be identified in a load file, metadata field, or otherwise as having these features (*e.g.*, branded with the words "Auto Date," "Auto File Name," or "Auto File Path").

H.   **Hidden Text:** ESI items shall be processed, to the extent practicable, in a manner that preserves hidden columns or rows, hidden text, worksheets, speaker notes, tracked changes, and comments.

I.   **Embedded Objects:** To the extent practical, Microsoft Excel spreadsheets (.xls) embedded in Microsoft Word documents will be extracted as separate documents and treated as attachments to the document. The Parties agree that other embedded objects, including, but not limited to, logos, icons, emoticons, and footers, may be culled from a document set and need not be produced as separate documents by a producing Party (*e.g.*, such embedded objects will be produced within the document itself, rather than as separate attachments). Notwithstanding the foregoing, documents that have already been previously processed need not be reprocessed to comply with this Paragraph.

J.   **Hyperlinked Files:** The Parties shall disclose whether they regularly use point-in-time or other documents that are transmitted as links in documents and emails, including products such as Google's G Suite (*e.g.*, links to Google Documents, Google Drive) or Microsoft 365 (*e.g.*, links from OneDrive, SharePoint, Teams), etc. The parties shall use their best efforts to collect and produce any such point-in-time documents that are links in the documents and emails, and timely disclose any issues with the ability to link attachments. Documents extracted from links shall be populated with the BEGATTACH and ENDATTACH metadata fields to show the family relationship. If documents cannot be extracted from links at the time of collection, the Parties agree to promptly meet and confer to discuss alternative methods of collection and production.

K.   **Compressed Files:** Compression file types (*i.e.*, .CAB, .GZ, .TAR, .Z, and .ZIP) shall be decompressed and extracted in a reiterative manner to ensure that a zip within a zip is decompressed into the lowest possible compression resulting in individual folders and/or files.

L.    **Password-Protected, Encrypted, or Proprietary-Software Files:** With respect to any ESI items that are password-protected or encrypted within the scope of review, the producing Party will take reasonable steps to obtain identified passwords and, to the extent practicable, remove such protection so that the documents can be reviewed and produced if appropriate. ESI that is likely to contain responsive information that cannot be reviewed because proprietary software is necessary to view the ESI will be disclosed to a requesting Party, and the Parties shall meet and confer regarding the next steps, if any, with respect to such ESI.

## V.    DOCUMENT SOURCE SCOPE AND DISCLOSURE PARAMETERS

A.    **Time Period:** The Parties agree that ultimately, they will be able to limit the processing of discoverable information to that which was created, modified, sent, or received during a particular time period for unstructured data (email, loose ESI, etc.). The parties will also agree on a time period for production of structured data. However, if the parties cannot agree on what those time periods will be, they will consequently raise that issue with the Court.

B.    **Document Source Negotiations:** To the extent the Parties agree or the Court orders that the scope of discovery requires negotiations regarding document custodians and sources, the following procedures shall apply. Defendants' position is that the scope of the limited discovery called for by the Court's June 17, 2025, Order (Dkt. 38) does not require negotiations regarding document custodians and sources, and thus these procedures are not applicable to that phase of discovery. Plaintiff disagrees with that position, but the Parties agree to address that dispute in the context of specific discovery requests.

1.    **Initial Document Custodians and Sources**: Each party will provide a list of proposed document custodians and non-custodial document sources (*e.g.*, centralized document sources other than an individual document custodian's files) reflecting those employees or sources with information and/or documents responsive to an agreed-upon or Court-ordered scope of Rule 34 Requests. The Parties shall be prepared to meet and confer regarding how discoverable information is stored and how it may be collected.

2.    **Additional Document Custodians or Sources:** If, after the Parties identify initial document custodians, a requesting Party believes that additional document custodians or sources should be added, then the requesting Party shall advise the producing Party in writing of the proposed additional document custodians or sources and the basis for the request. If the Parties are unable to agree on whether to add the document custodian or source, then the matter may be brought to the Court. The parties shall comply with the Civil Practice Standards and/or individual rules and preferences for handling discovery disputes of the Article III and/or Magistrate Judge presiding over this litigation.

3.    The Parties' discussion of proposed search terms, document custodians, or sources does not preclude a Party from requesting additional search terms, document

custodians, or sources pursuant to the terms of this ESI Protocol; nor does it preclude a Party from objecting to any such additional requests.

## VI.    PARAMETERS FOR CULLING OF PAPER AND ESI DOCUMENTS

A.    **Applicability:** To the extent the Parties agree or the Court orders that the scope of discovery requires negotiations regarding the parameters for culling of paper and ESI documents, the following procedures shall apply. Defendants' position is that the scope of the limited discovery called for by the Court's June 17, 2025, Order (Dkt. 38) does not require negotiations regarding the parameters for culling of paper and ESI documents, and thus these procedures are not applicable to that phase of discovery. Plaintiff disagrees with that position, but the Parties agree to address that dispute in the context of specific discovery requests.

B.    **General Provisions:**

1.    **Meet and Confer**: A requesting or producing Party may, in good faith, seek to expand or contract the scope of a search. Where such a request is made, the Parties will meet and confer and attempt in good faith to reach agreement as to the timing and conditions of such expansion or contraction. If the Parties cannot reach agreement, any dispute may be presented to the Court. All meet and confer sessions under this Paragraph will give appropriate consideration to minimizing expense and ensuring responsive documents are produced.

2.    **Non-Waiver**: The Parties' discussion of proposed search terms does not preclude a Party from requesting additional search terms pursuant to the terms of this ESI Protocol as discovery and the Litigation progress nor does it preclude a Party from objecting to any such additional search terms requested.

C.    **Pre-Search Deduplication & Culling of Collected Data:**

1.    **De-Duplication:** Before running a search process described herein, to the extent practical, data should be de-duplicated in accordance with ¶ IV(E).

2.    **Paper Documents:** The Parties agree to meet and confer to determine whether paper documents scanned to electronic form for litigation may be included in any keyword or TAR process.

3.    **Targeted Collections:** Only documents a producing Party intends to subject to electronic searching parameters should be included in the data set against which search terms are tested. As a hypothetical example, a centralized, non-custodial folder of responsive wage surveys that a Defendant intends to produce in its entirety should not be included in the data set against which search terms are tested.

4.    **Exception Reporting:** For any documents not otherwise identified as system or operating files, that are reasonably likely to contain relevant information, and are not otherwise covered by this ESI Protocol, if known, the producing Party must

disclose processing exceptions that are unresolved no later than seven days after the time set for substantial completion of document productions.

5. **Disclosure of Other Culling Parameters Required:** A producing Party is permitted to cull data using the agreed-upon custodial and non-custodial sources, agreed-upon date parameters, and agreed-upon search terms (if applicable), and a producing Party is permitted to remove known system or operating files, such as those that appear on the National Software Reference Library (NSRL) hash list. As such, the Parties may cull entire file directories from computer hard drives that contain Program Files, Program Data, SWTOOLS, Windows Operating System files, etc. For those excluded directories, the Parties will only conduct searches on user-created content that is reviewable and likely to yield relevant content. To the extent a producing Party wishes to use additional culling parameters, those parameters will be disclosed and will be subject to meet and confer requirements.

## D.   **Culling Collected Data**

1. **Use of Search Terms to Cull Unstructured ESI:**

   a.   The Parties may use search terms and other limiters, including, by way of example only, date ranges and email domains in metadata fields, as a means of limiting the volumes of information to be reviewed for responsiveness.

   b.   To the extent that search terms are used to identify responsive ESI, a producing Party will notify the requesting Party of its intent to use search terms and disclose to the requesting Party: (1) an initial list of search terms the producing Party intends to use, (2) whether the producing Party intends to use different search terms or other limiters with different Document Custodians or Sources, (3) per-term hit counts (number of documents containing hits, number of documents containing hits plus attachments, and number of documents containing unique hits) for each proposed term, and (4) the total number of documents (at both the individual document level and family level) that would be in the search universe both (a) without application of the search terms and limiters and (b) with application of the search terms and limiters. The Parties will meet and confer in good faith regarding the disclosure and formulation of appropriate search terms and protocols to cull unstructured ESI.

2. **Addition or Removal of Search Terms After Initial Search Term Negotiation:** If, after the completion of the initial search term negotiations, a requesting or producing Party determines that any search terms should be added to or removed from the initial search term list, then the requesting or producing Party shall advise the affected Parties in writing of the proposed change(s) to the search term(s) and of the reason(s) for the proposed change(s). Upon receiving the opposing Party's requested modifications, to the extent the producing Party objects to any of the modifications or seeks to modify them, it will provide the hit count and overall volume information required by ¶ **Error! Reference source not found.**(b) above, b oth for the requesting Party's proposed search term list and for the producing Party's revised proposed search term list. The requesting Party may propose further

rounds of modifications to the search parameters using this process until the Parties have reached agreement or impasse on the search parameters. The Parties recognize that the formulation of appropriate search parameters is often an iterative process that requires cooperation. The Parties also recognize that tools such as random sampling of hits (and disclosing the results of such sampling) may be helpful and appropriate to provide further information about the relevance and burden of particular search terms that may be in dispute. Except by agreement or by order of the Court, a producing Party is not required to add search terms after completion of the processes described herein.

3.   The Parties will cooperate in good faith regarding the disclosure and formulation of appropriate search terms and protocols to cull unstructured ESI. To the extent necessary to resolve any disputes that arise because of proposed search parameters, the Parties shall meet and confer in good faith. Any disputes that cannot be resolved may be submitted by either Party to the Court for further consideration and resolution.

4.   **Further Modification of Search Methodology After Agreement on Initial Methodology:** The Parties are free to request additional modifications to the search methodology (including additional search terms) once the initial methodology has been agreed upon or resolved by the Court. However, the Party requesting any such modifications should explain the reason for each modification sought. The Parties should generally employ the procedures in ¶ VI(D)(1)(b) & (D)(2) (including disclosure of hit count data) to negotiate such requests.

5.   **Use of Technology Assisted Review or Other Advanced Technology-Based Analytics to Cull Unstructured ESI:**

   a.   **Use of TAR:** A Party may use Technology Assisted Review ("TAR"), Continuous Active Learning review ("CAL"), Relativity aiR, or similar alternative technology, or combination of technologies, to sort documents for linear review without disclosure of that use. If a Party elects to use TAR, CAL, Relativity aiR, or similar alternative technology, or combination of technologies, to cull or otherwise limit the volume of unstructured ESI subject to linear review, that Party will disclose that election and the proposed methodology to be applied to the opposing Parties reasonably in advance of any deadline for reaching agreement on search methodologies and the Parties will meet and confer in good faith to discuss parameters for the use of that technology and methodology in those instances. In the event a producing Party who elects to use TAR, CAL, or similar alternative technology to cull or otherwise limit the volume of unstructured ESI subject to review also intends to cull or otherwise limit such volume by additional means, such as by applying search terms, then the Parties shall meet and confer in advance of such layering of multiple culling technologies.

      i.   **Specific Document Types:** The Parties will not use TAR or any similar alternative technology to exclude spreadsheets such as MS Excel files from review or exclude any images, audio files or video

files. The Parties agree to meet and confer to determine whether paper documents may be included in a TAR process.

ii.    **The TAR or Similar Tool:** A producing Party shall describe to a requesting Party the vendor and the TAR technology or tool (or any similar alternative technology) being used, including a description of the tool's procedures, which document types it will be applied to, and prioritization and training of the tool. At the outset of the tool's use, the producing Party will also provide recall and precision metrics (based on a knowledgeable reviewer's review and coding of a random sample of documents from the universe of documents to which the producing Party intends to apply TAR or any similar alternative technology) for the tool. The producing Party will disclose the number of documents in the validation sample (which should be sufficiently large to generate statistically meaningful results) and will produce (subject to privilege) the responsive documents (from the sample) that the tool incorrectly identified as non-responsive. If the requesting Party objects, based on the results of this validation analysis or other aspects of the requesting Party's proposal to use TAR or any similar alternative technology, to the proposed use of that tool, the Parties will meet and confer about the producing Party's intent to use that tool. The validation procedure described in this paragraph is distinct from the more comprehensive procedure contemplated in the introduction for validating the sufficiency of each Party's document review (whether manual, TAR-based, or both) at the point when that Party claims substantial completion.

b.    A producing Party need not conduct any additional review of information subjected to, but not retrieved by, a TAR tool as part of the identification of the subset of information that will be subject to review and production.

## C.    Custodial Cellphone & Personal Communications Data

1.    **Cellphones: To the extent within permissible discovery and not subject to a valid objection,** for Document Custodians agreed on by the Parties or ordered by the Court, a producing Party will take reasonable steps to identify whether any unique, responsive ESI (including cell phone call logs, voicemails, voicemail logs, text messages and/or iMessages, chats [such as WhatsApp, Signal, and Facebook Messenger], notes, calendar items, emails, Word documents, photographs, audio recordings, and video recordings), if any, is located on any devices (including mobile phones, tablets, and computers) in the "possession, custody, or control" (as defined under the Federal Rules and case law) of the producing Party. Unless agreed otherwise, the following shall govern the identification of unique, responsive, and non-privileged communications for cellphone-based data for the agreed or ordered Document Custodians with respect to cellphones in the possession, custody, or control of the producing Party.

a.    If a party reasonably believes that responsive and discoverable

information or material is only located on a cellphone used by a designated Document Custodian for work purposes, and the information or material is not otherwise being produced, within 14 days of designation of a Document Custodian or with its discovery responses, whether by agreement or Court order, a producing Party will disclose if it takes the position that a Document Custodian possesses a cellphone that (i) was used for work purposes that is not within the producing Party's possession, custody, or control, and (ii) is believed to contain unique, responsive ESI; however, nothing in this ESI Protocol obligates a producing Party to subpoena a third-party to obtain the information described below.  If a requesting Party intends to issue a third-party subpoena directed at an employee of a producing Party concerning that employee's cellphone that is not in the producing Party's possession, custody or control,  the requesting Party will provide notice of its intent to the producing Party so that the Parties may meet and confer regarding the third-party subpoena. The requesting Party may  serve the subpoena no earlier than 3 business days after the date of notice or at  such earlier time agreed by the Parties.

b.     A producing Party shall use reasonable due diligence to  ensure that reasonably available sources of data/applications on a cellphone (and related backups and  archives, if those data sources/applications contain work-related information) are evaluated and considered as a  potential source of data subject to discovery, including  without limitation call and voicemail logs, text messages,  contacts, and image files (*e.g.*, pictures and videos).  A producing Party shall not be required to  disclose any other cellphone-related information prior to  any culling of cellphone data.

c.     A producing Party will consider the sources of information on a cellphone identified below, to the extent  reasonably available, to identify unique, responsive, and  discoverable information.  The Parties will also meet and confer regarding any culling of the sources of  information below.

    i.     **Cellphone Call and Voicemail Logs:** The logs of  any calls made/received to or from  a Document Custodian, and logs of voicemails on a cellphone that the Document Custodian  used for work purposes, if any, if the cellphone  is in the possession, custody, or control of a producing Party.

    ii.    **Text Messages:**  All text messages and/or iMessages, or any other type of message or chat  on a Document Custodian's cellphone device  used for work purposes, if any, if the cellphone  is in the possession, custody, or control of a  producing Party.

d.     The Parties shall have the right to convert text message conversations and similar data to Relativity Short Message Format and to review and produce such data in that format.

VII.    **Structured Data:** To the extent a response to discovery requires production of discoverable ESI contained in a structured database, the Parties shall meet and confer in an attempt to agree upon a set of queries to be made for discoverable information and generate a report in a reasonably usable and exportable electronic file (*e.g.*, Excel or CSV format) for review by the Requesting Party. Upon review of the report, the Requesting Party may make reasonable requests for additional information to explain the database schema, codes, abbreviations, and different report formats or to request specific data from identified fields.

## VIII. <u>CLAIMS OF PRIVILEGE AND REDACTIONS</u>

A.    The Parties agree that they need not initially exchange the text of litigation hold/retention instructions issued in this Litigation.

B.    **Production of Privilege Logs:** Except as provided otherwise below, for any document withheld in its entirety or produced but redacted, the producing Party will produce privilege/redaction logs in MS Excel format or any other format that permits electronic sorting and searching.

C.    **Exclusions from Logging Potentially Privileged Documents:** The following categories of documents do not need to be contained on a producing Party's privilege log, unless good cause exists to require that a Party do so.

1.    Information generated before the beginning of the relevant discovery period agreed to by the Parties or ordered by the Court. While reserving all rights with respect to the relevant time period for discovery, the Parties agree that information generated after **December 26, 2024** also need not be logged. This provision does not apply to non-Parties to the Litigation.

2.    Any communications exclusively between a producing Party and its outside counsel, any non-testifying experts in connection with specific litigation, or, with respect to information protected by Federal Rule of Civil Procedure 26(b)(4), testifying experts in connection with specific litigation.

3.    Any privileged materials or work product created by a Party's outside counsel, any non-testifying experts in connection with specific litigation, or, with respect to information protected by Federal Rule of Civil Procedure 26(b)(4), testifying experts in connection with specific litigation.

D.    **Privilege Log Requirements:**

1.    **Privilege Log:** To the extent applicable, each Party's privilege log only needs to provide objective metadata (to the extent it is reasonably available and does not reflect privileged or protected information), a description of the privilege or protection being asserted, and identification of the attorney(s) associated with the document, consistent with Fed. R. Civ. P. 26(b)(5).

a.    Objective metadata includes the following (as applicable to the document types as shown in Appendix 1):

    i.   A unique privilege log identifier

    ii.   A family relationship identifier

    iii.   Custodian

    iv.   CustodianOther or CustodianAll (if applicable)

    v.   Subject/File Name

    vi.   Email Subject

    vii.   Author

    viii.   From

    ix.   To

    x.   CC

    xi.   BCC

    xii.   Date Sent

    xiii.   Date Received

    xiv.   Date Created

b.    In addition to the objective metadata fields, a Party must also indicate which privilege or protection is being asserted, include a field on its privilege log entitled "Attorney/Description of Privileged Material" that contains a brief description of the privileged or protected material, and identify which persons associated with the document (*i.e.*, senders, recipients, or authors) are attorneys. Further, for any document withheld for which there is no objective metadata, a Party must manually populate on its privilege log an author and date, unless such information is not reasonably discernable from the document or the information is not necessary to evaluate the claim of privilege in light of the metadata that is discernable and/or the information provided in the Attorney/Description of Privileged Material field.

c.    With respect to the "Email Subject" or "File Name" field, the producing Party may substitute a description of the document where the contents of these fields may reveal privileged information. In the privilege log(s), the producing Party shall identify each instance in which it has modified the content of the "Email Subject" or "File Name" field.

d.    If a document is withheld on the basis of work product, in addition to the objective metadata fields, a Party must also include the basis of the claim in the manner required by Fed. R. Civ. P. 26.

2.    **Email Chains:** If there is more than one branch of (*i.e.*, more than one unique group of recipients of) an email thread, each branch will be individually logged; however, each individual email within the thread need not be logged if the recipients of the email chain are all identical or if a Party has elected to use threading for review and/or production of emails. A Party asserting privilege over a chain of emails may produce only a single redacted copy of such email chain consistent with ¶ VIII(E) below to the extent some portions are only partially privileged, except that any

unique branches of the email chain must also either be produced in redacted form or included on the metadata privilege log.

E.   **Challenges to Privilege Claims:** Following the receipt of a privilege/redaction log, a requesting Party may identify, in writing (by Bates/unique identification number), the particular documents that it believes require further explanation. The producing Party shall endeavor to respond to such a request within 10 business days. If a Party challenges a request for further information, the Parties shall meet and confer to try to reach a mutually agreeable solution. If they cannot agree, the matter may be brought to the Court.

F.   **Attorney's Ethical Responsibilities:** Nothing in this order overrides any attorney's ethical responsibilities to refrain from examining or disclosing materials that the attorney knows or reasonably should know to be privileged and to inform the Disclosing Party that such materials have been produced.

## IX.   MISCELLANEOUS PROVISIONS

A.   **Objections Preserved:** Nothing in this ESI Protocol shall be interpreted to require disclosure of information protected by the attorney-client privilege, work product doctrine, or any other applicable privilege or immunity. Except as provided expressly herein, the Parties do not waive by virtue of this order any objections as to the production, discoverability, authenticity, admissibility, or confidentiality of documents and ESI. Further, nothing in this ESI Protocol shall be interpreted as an agreement regarding the permissible scope of discovery or waiver to any objection based on over breadth, undue burden or expense, or relevance.

B.   **Inaccessible ESI:** If a producing Party asserts that certain categories of ESI that are reasonably likely to contain responsive information are inaccessible or otherwise unnecessary under the circumstances, or if the requesting Party asserts that, following production, certain ESI is not reasonably usable, the Parties shall meet and confer to discuss resolving such assertions. If the Parties cannot resolve any such disputes after such a meet and confer has taken place, the issue shall be presented to the Court for resolution. The following types of data stores are presumed to be inaccessible and are not subject to discovery, and need not be collected or preserved, absent a particularized need for the data as established by the facts and legal issues of the case (*e.g.*, information suggesting that relevant evidence has been lost or is no longer available in other more accessible forms):

1.   Deleted, slack, fragmented, or other data only accessible by forensics;

2.   Random access memory (RAM) or temporary files; and

3.   Server, system, or network logs.

C.   **Variations or Modifications:** The Parties will use reasonable efforts to comply with the ESI Protocol. Variations from this ESI Protocol may be required. Any practice or procedure set forth herein may be varied by agreement of all affected Plaintiffs and all affected Defendants, which will be confirmed in writing. In the event a producing Party determines that a variation or modification is appropriate or necessary to facilitate the timely and

economical production of documents or ESI, the producing Party will notify the requesting Party of the variation or modification. Upon request by the requesting Party, those Parties will meet and confer to address any issues in a reasonable and timely manner prior to seeking Court intervention. To the extent the parties cannot resolve the dispute, the producing Party must seek relief from the Court if it wants to deviate from this ESI Protocol. No Party who in good faith attempts to comply with this ESI Protocol will be deemed in breach hereof.

IT IS SO STIPULATED, through Counsel of Record.

/s/ *Stephen J. Teti*
Stephen J. Teti (admitted *pro hac vice*)
Kristie A. LaSalle (admitted *pro hac vice*)
**LOCKRIDGE GRINDAL NAUEN PLLP**
265 Franklin Street, Suite 1702
Boston, MA 02110
T: (617) 535-3763
sjteti@locklaw.com
kalasalle@locklaw.com

Brian D. Clark (admitted *pro hac vice*)
Derek C. Waller (*pro hac vice* forthcoming*)*
**LOCKRIDGE GRINDAL NAUEN PLLP**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
T: (612) 339-6900
F: (612) 339-0981
bdclark@locklaw.com
dcwaller@locklaw.com

**COUNSEL FOR PLAINTIFF AND INTERIM LEAD CLASS COUNSEL**

Stephen M. Prignano
**MCINTYRE TATE LLP**
50 Park Row West, Suite 109
Providence, RI 02903
T: (401) 351-7700
sprignano@mcintyretate.com

**INTERIM LIAISON CLASS COUNSEL**

/s/ *Rebecca F. Briggs*
Rebecca F. Briggs (#8114)
**Hinckley, Allen & Snyder LLP**
100 Westminster Street, Suite 1500
Providence, RI 02903-2319
T: (401) 274-2000
F: (401) 277-9600
rbriggs@hinckleyallen.com

Frank Pasquesi (admitted *pro hac vice*)
**Foley & Lardner LLP**
321 North Clark Street, Suite 3000
Chicago, Illinois 60654
Telephone: (312) 832-4500
fpasquesi@foley.com

Michael D. Leffel (admitted *pro hac vice*)
**Foley & Lardner LLP**
150 East Gilman Street, Suite 5000
Madison, Wisconsin 53703
Telephone: (608) 258-4216
mleffel@foley.com

Anne-Louise T. Mittal (admitted *pro hac vice*)
Gerald S. Kerska (admitted *pro hac vice*)
David J. Wenthold (admitted *pro hac vice*)
**Foley & Lardner LLP**

777 E Wisconsin Ave
Milwaukee, Wisconsin 53202
Telephone: (414) 297-4916
amittal@foley.com
gkerska@foley.com
dwenthold@foley.com

**ATTORNEYS FOR DEFENDANT
CAREMARK RX, L.L.C.**

/s/ *John A. Caletri*
John A. Caletri (#6204)
**McAngus Goudelock & Courie LLC**
40 Westminster Street, Suite 201
Providence, RI  02903
Telephone: (401) 600-2809
John.caletri@mgclaw.com

**ATTORNEYS FOR DEFENDANT
PRUDENTRX LLC**

PURSUANT TO THE STIPULATION, IT IS SO ORDERED.

DATED:      September 24, 2025

Hon. Amy E. Moses
United States Magistrate Judge

## Appendix 1: ESI Metadata and Coding Fields

| Field Name[1] | Populated For (*Email, Edoc, Calendar, Contact, Cellphone, or All*) | Field Description |
|---|---|---|
| BegBates | All | Control Numbers. |
| EndBates | All | Control Numbers. |
| Attachnames | Email | Names of each individual attachment, separated by semicolons |
| ParentID | All | Bates number of the family parent |
| BegAttach | All | Control Numbers (First production Bates number of the first document of the family). |
| EndAttach | All | Control Numbers (Last production Bates number of the last document of the family). |
| Custodian | All | Custodian name (ex. John Doe). |
| Source | All | Name of party producing the document/data |
| DupCust, CustodianOther, or CustodianAll | All | All custodians who were in possession of a de-duplicated document besides the individual identified in the "Custodian" field. |
| LogicalPath | All ESI Items | The directory structure of the original file(s). Any container name is included in the path. |
| Hash Value | All | The MD5 or SHA-1 hash value. |
| NativeFile | All | Native File Link (filename of native file) |
| Email Thread ID | Email | Unique identification number that permits threading of email conversations. For instance, unique MS Outlook identification number ("PR_CONVERSATION_INDEX") is 22 bytes in length, followed by zero or more child blocks each 5 bytes in length, that facilitates use of email threading. |
| Thread Index | Email | Message header identifier, distinct from "PR_Conversation_Index", that permits threading of email chains in review software. |
| EmailSubject | Email | Subject line of email. |
| DateSent | Email | Date email was sent. |
| DateMod | Email, Edoc | Date the document was last modified. |
| TimeSent | Email | Time email was sent. |

---

[1] Field Names can vary from system to system and even between different versions of systems. Thus, Parties are to be guided by these Field Names and Field Descriptions when identifying the metadata fields to be produced for a given document pursuant to this ESI Protocol. To the extent that a Party does not produce metadata for one of these field names, the Parties will meet and confer in good faith about the metadata that the Parties do possess and the extent to which other metadata information provides the substantive information for the Field Name metadata that is not provided.

| Field Name[1] | Populated For (*Email, Edoc, Calendar, Contact, Cellphone, or All*) | Field Description |
|---|---|---|
| TimeZoneUsed | All | Time zone used to process data during document collection and processing. |
| Receive Date | Email | Date Email was received |
| ReceiveTime | Email | Time email was received. |
| To | Email | All recipients that were included on the "To" line of the email. |
| From | Email | The name and email address of the sender of the email. |
| CC | Email | All recipients that were included on the "CC" line of the email. |
| BCC | Email | All recipients that were included on the "BCC" line of the email. |
| DateCreated | Edoc | Date the document was created. |
| LastModified | Edoc | Last modified date in MM/dd/yyyy, HH:mm:ss, Z Format |
| FileName | Email, Edoc | File name of the edoc or subject line of an email. |
| Title | Edoc | Any value populated in the Title field of the document properties. |
| Subject | Edoc | Any value populated in the Subject field of the document properties. |
| Author | Edoc | Any value populated in the Author field of the document properties. |
| ModifiedBy | Edoc | Name of person(s) who modified the document |
| DocExt | All | File extension of the document. |
| DocType | All | Document type (*e.g.*, Excel) |
| TextPath | All | Relative path to the document level text file. |
| Redacted | All | "X," "Y," "Yes," and "True" are all acceptable indicators that the document is redacted. Otherwise, blank. |
| MessageID | Email | Unique message id from internet headers |
| InReplyTo | Email | Message id of email this email is in reply to |
| Withheld Placeholder | All | To the extent a document is fully withheld (on the basis of privilege or otherwise), this field must be populated with a "Y." See also ¶ II(G) above. |
| Privilege Asserted | All | To the extent a document has been withheld on the basis of privilege or redacted on the basis of privilege, the text pertaining to such assertion of privilege shall be included as a metadata field (e.g., "Redacted – Attorney Client Privileged" or "Withheld – Attorney Client Privileged"). |
| Paper | All | "Y" if document is scanned from hard copy in connection with the collection and production of documents in this matter. |

| Field Name[1] | Populated For (*Email, Edoc, Calendar, Contact, Cellphone, or All*) | Field Description |
|---|---|---|
| Legend/Confidentiality | All | Indicates if document has been designated as "Confidential" or "Highly Confidential" under the Protective Order. |
| Attachment Count | Email, Edoc | Identifies the number of attachments to an email (if present/applicable). |
| Attachment Names | Email, Edoc | Identifies the file names of all attachments to an email (if present/applicable). |
| Calendar Date Begin | Calendar | Identifies the begin date of a calendar entry (if present). |
| Calendar Date End | Calendar | Identifies the end date of a calendar entry (if present). |
| Calendar Time Begin | Calendar | Identifies the begin time of a calendar entry (if present). |
| Calendar Time End | Calendar | Identifies the end time of a calendar entry (if present). |
| Production Volume | All | Identifies the unique production volume ID of the delivery (ABC001). |
| NativeLink | All | Native File Link (Native Files only) |
| Hyperlinked | All | Y if hyperlinked, otherwise N or empty. |
| De-Duped Custodians | All | All Individual(s) whose documents de-duplicated out (De-Duped Custodian) through exact match HASH value. |
| Duplicate Filepath | All | Folder locations of documents by held by other custodians whose copy of the document was not produced based on exact match HASH value de-duplication. Folder names shall be delimited by semicolons and include originating custodian name. |
| Hidden Content[2] | All | Y if hidden content, otherwise N or empty |

---

[2] "Hidden Content" for purposes of this field shall include track changes, comments, hidden slides, hidden columns, hidden worksheets, or other hidden text.