# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| SHEILA GLUESING, individually and on behalf of all others similarly situated,<br><br>　　　　　　　　　　　Plaintiff,<br><br>　v.<br><br>PRUDENTRX LLC & CAREMARK RX, LLC<br><br><br>　　　　　　　　　　　Defendants. | No. 1:24-CV-00549-JJM-LDA<br><br>Oral Argument Requested |

**PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DISCOVERY RELATED TO CLAIMS OF ECONOMIC DURESS**

**TABLE OF CONTENTS**

I.   **INTRODUCTION**.................................................................................................................. 1

II.  **BACKGROUND** .................................................................................................................. 3

    A.   Defendants forced Plaintiff to use CVS Specialty as part of their unlawful scheme. ............................................................................................................................ 3

    B.   The Court ordered discovery into the issue of economic duress. .................................... 4

    C.   Plaintiff seeks information consistent with Court-ordered discovery into economic duress. ............................................................................................................ 5

    D.   Defendants refuse to produce documents responsive to Plaintiff's Requests. ............... 6

III. **ARGUMENT**....................................................................................................................... 7

    A.   Plaintiff articulates a viable theory of economic duress under New York Law............. 8

    B.   The discovery sought in Requests Nos. 1, 3, and 6 are relevant to Plaintiff's theory of economic duress.............................................................................................. 9

    C.   Allowing Defendants to artificially narrow the scope of discovery will only increase the burdens to the Court and Plaintiff in the long run. ............................ 11

IV.  **CONCLUSION** ................................................................................................................. 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brennan v. Bally Total Fitness*
  198 F. Supp. 2d 377 (S.D.N.Y. 2002) ........................................................................................... 9

*Fudge v. Time Warner Cable, Inc.*,
  2017 WL 2836992 (D. Mass. June 30, 2017) ............................................................................. 7

*Kamerman v. Steinberg*,
  891 F.2d 424 (2d Cir. 1989) ....................................................................................................... 8

*Nat'l Football League*,
  244 F.3d 114 (2d Cir. 2001) ....................................................................................................... 8

*Nat'l Liab. & Fire Ins. Co. v. Carman*,
  2017 WL 11477214 (D.R.I., Dec. 12, 2017) .............................................................................. 7

*S.E.C. v. McCabe*,
  2014 WL 7405518 (D. Utah Dec. 30, 2014) .......................................................................... 7, 9

**Rules**

Federal Rule of Civil Procedure 26(b)(1) ........................................................................................ 7

## I.  INTRODUCTION

The Court ordered discovery concerning "the issue of economic duress" when Plaintiff accepted CVS Specialty Pharmacy's Terms of Use, which contained an arbitration clause. *See* ECF No. 38 at 1. The parties have made little progress. This is due nearly entirely to a fundamental dispute over the scope of this phase of discovery. While the Parties have met and conferred on this issue several times, this dispute permeates discovery and requires resolution by the Court.

As Plaintiff previously explained, Defendants force her and patients like her to use CVS Specialty and *only* CVS Specialty to obtain medications subject to the PrudentRx Program. ECF No. 24 at 19; Compl. ¶¶ 59, 119, 176. If a patient refuses, they must shoulder the full cost of exorbitantly expensive medications which—under the PrudentRx Program—Defendants refuse to cap at the federally mandated limits on patient expenses. So, economically, patients targeted by the Program have no choice but to acquiesce to CVS Specialty's arbitration clause that (Defendants claim) strips those targeted patients of the right to challenge Defendants' unlawful actions.[1]

These facts fit New York law's definition of economic duress:[2] an unlawful threat that leaves a person with no choice but to accept unfavorable contract terms. Yet Defendants seek to artificially narrow the Court-ordered discovery by imposing a limitation not found in New York law: that any duress must arise from circumstances unique and specific to Plaintiff. Thus, they refuse to search for or produce:

---

[1] Plaintiff does not agree with Defendants that they may invoke CVS Specialty's arbitration clause. The clause applies only to disputes between CVS Specialty and patients—and even if it could be interpreted to apply to the pharmacy's "subsidiaries or affiliates," neither Defendant is a subsidiary or affiliate. *See* ECF No. 24 at 24–25. Plaintiff will reiterate this argument in response to Defendants' anticipated renewed motion to compel arbitration if warranted.

[2] The parties agree New York law applies to this question.

- Materials concerning whether Defendants' PrudentRx Program required Plaintiff and all targeted patients to use CVS Specialty exclusively to fill prescriptions for their targeted medications (Request No. 1);

- Materials showing whether cost penalties imposed by Defendants for refusal to use CVS Specialty precluded Plaintiff and all targeted patients from any other economically feasible choice of pharmacy (Request No. 3); and

- Materials showing Defendants knew or intended their requirement that Plaintiff and all targeted patients use CVS Specialty would force patients to acquiesce not only to Defendants' choice of pharmacy, but to that pharmacy's Terms of Use, which purported to strip them of their right to sue (Request No. 6).

Defendants claim these materials are beyond the scope of this phase of discovery because they are also relevant to other targeted patients.[3]

But Plaintiff's economic duress flows from structural aspects of the PrudentRx Program. Discovery concerning that structure is relevant to her economic duress argument. How and why Defendants force targeted patients (including Plaintiff) to use CVS Specialty and thus to accept its Terms of Use is relevant and within the scope of the Court's Order. Whether the Program's structure leaves patients with any other viable economic option to obtain their medications is relevant and within the scope. And whether Defendants designed the Program intending or knowing that it would coerce patients to give up their right to sue is relevant and within the scope. Accordingly, Plaintiff respectfully requests that the Court compel Defendants to produce materials responsive to her First, Third, and Sixth Requests for Production of Documents ("Requests").

---

[3] Defendants have not articulated any objection that the discovery sought, if relevant, is unduly burdensome; only that the discovery is not relevant. LaSalle Decl. Ex. G (Caremark's Resps. to Pl.'s Requests for Production of Documents) at No. 2; *id.* Ex. H (PrudentRx's Resps. to Pl.'s Requests for Production of Documents) at No. 2. They should not now be permitted to manufacture such an objection; however, if they do, Plaintiff will address that new argument in reply.

## II. BACKGROUND

### A. Defendants forced Plaintiff to use CVS Specialty as part of their unlawful scheme.

Plaintiff's Complaint alleges that Defendants devised and operate a scheme to deprive patients like her of financial assistance meant to help afford medications necessary to protect their health (and sometimes their very lives). *See* Compl ¶¶ 1, 9, 68. Defendants force targeted patients to enroll in the PrudentRx Program and then in a patient copay assistance program. *Id.* ¶¶ 12, 83. Then Defendants siphon off 100% of available copay assistance to benefit the patients' insurer and themselves, rather than the patient. *See id.* ¶¶ 2, 68, 103. They accomplish this through the threat of financial ruin. If a targeted patient refuses to enroll, Defendants charge the patient steep copays that can add up to tens or even hundreds of thousands of dollars a year. *See id.* ¶ 84. Most patients relent because they cannot afford to do otherwise. *See id.* But this is not even the most coercive threat inherent in the PrudentRx Program.

A critical aspect of Defendants' scheme is the requirement that targeted patients fill all targeted prescriptions through CVS Specialty. *See id.* ¶¶ 38, 59. CVS Specialty is owned and controlled by Defendant Caremark and is a lynchpin of the PrudentRx Program's operation. *See id.* ¶¶ 9, 20, 68, 175. If a targeted patient tries to fill a targeted prescription elsewhere, they must pay the full list price. *See id.* ¶ 176; Decl. of Kristie LaSalle Ex. A (CAREMARK-0000064–198) at -109 ("You must purchase specialty drugs through the specialty pharmacy program. The specialty pharmacy program is limited to CVS Specialty®. If you purchase specialty drugs outside the specialty pharmacy program, you are responsible for the entire cost of the drug."). That list

3

price is, on average, $200,000 per year. *See* Compl. ¶ 54. Few, if any, targeted patients could afford such a cost on top of all other healthcare costs.[4] *See id.* ¶¶ 4, 53.

### B.     The Court ordered discovery into the issue of economic duress.

To obtain medications from CVS Specialty, targeted patients must agree to CVS Specialty's Terms of Use.[5] Those Terms include a clause requiring arbitration of disputes between a targeted patient and CVS Specialty. *See* Decl. of Allison Johansson Ex. 1 (CVS Specialty Terms of Use), ECF No. 21-2, at ECF pp. 20–21. Accordingly, targeted patients must give up their right to go to court or else incur financially ruinous charges for the full list price of their medications. Plaintiff is one such targeted patient. *See* Compl. ¶¶ 16, 128.

This scheme—requiring a targeted patient to use only a pharmacy that requires the patient to agree to give up their legal rights or else face unbearable medical costs—is coercive. It is designed to obtain purported consent to arbitrate under economic duress. *See* ECF No. 24 at 17–23. As Plaintiff explained, "[i]t is hard to envision how CVS Specialty [] could have created a more coercive means of forcing agreement" to an arbitration clause:

---

[4] By law, patients' payments must count toward their deductible and annual cost-sharing limitations. *See* Compl. ¶¶ 47–50. Defendants claim to evade this requirement. *Id.* ¶¶ 54, 67.

[5] For the first time in their reply in support of their motion to compel, Defendants contended that targeted patients could avoid agreeing to arbitrate if they called CVS Specialty instead of using the pharmacy's online services. *See* ECF No. 28-1 at 9. This claim is dubious, at best. In response to an interrogatory asking where, if anywhere, that option was disclosed to targeted patients like Ms. Gluesing, Caremark responded (only with respect to Plaintiff) and described four such locations: (1) CVS Specialty's Terms of Use, (2) CVS Specialty's "New Patient Guide," (3) CVS Specialty's website, and (4) Ms. Gluesing's insurer's website. LaSalle Decl. Ex. I (Caremark's Resps. to Interrogs.) at No. 2. (PrudentRx did not identify any locations. *Id.* Ex. J (PrudentRx's Resps. to Interrogs.) at No. 2). Upon review, none of the sources Defendants identified discloses to targeted patients the option to avoid agreeing to arbitrate. Plaintiff propounded two additional requests for production of documents relevant to this issue (Requests Nos. 4 and 5); and have proposed a compromise to resolve any disputes as to those Requests. Should the Defendants reject the proposal, and the Parties reach an impasse, Plaintiff reserves the right to bring that dispute to the Court as well.

> Ms. Gluesing and other targeted patients need access to their medications to treat complex, often life-threatening conditions. Many of them could die without their medications—eaten away by cancer, gasping for breath with asthma, or suffering with an infection caused by atopic dermatitis. Because of the way Defendants structure the PrudentRx Copay Assistance Fraud Enterprise, targeted patients can only fill their prescriptions at CVS Specialty Pharmacy. If they go elsewhere, they would have to pay the medication's full sticker price because, while PBMs like Caremark negotiate discounts off medications' list prices, they refuse to share those discounts with patients. Specialty medications cost more than $16,667 per month on average; over half of patients cannot afford even 1% of that.
>
> By wedging an arbitration agreement between Ms. Gluesing and her only source of her medication, CVS Specialty Pharmacy wrongfully denied her access to her prescriptions unless she forfeited her right to go to court . . . . The "choice" the pharmacy offered is stark: give up your litigation rights or risk death or financial ruin. This is no choice at all.

*Id.* at 18–19 (citations omitted). Thus, Plaintiff's theory of economic duress is not tied to her unique financial situation. The coercion and duress are systemic and structural: the PrudentRx Program shunts all targeted patients (including Plaintiff) to a pharmacy that forces them to forfeit their day in court.

### C. Plaintiff seeks information consistent with Court-ordered discovery into economic duress.

Consistent with the Court's Order, Plaintiff promptly sought discovery into whether Defendants, through the PrudentRx Program, forced Plaintiff and other targeted patients to agree to arbitrate through economic duress as Plaintiff described.

The bulk of Plaintiff's Requests seek to answer a simple question: did the PrudentRx Program's design economically coerce targeted patients into giving up their right to sue? The Requests seek information concerning the Program's requirement that targeted patients obtain medications through CVS Specialty and the cost implications if they do not, *see* LaSalle Decl. Ex. B (Pl.'s Request for Production of Documents) ("Pl.'s RFPs") at Request No. 1; targeted patients'

5

ability to withstand those cost differences, *id.* at Request No. 3; and whether Defendants considered targeted patients' cost tolerances when deciding to force them to use CVS Specialty, *see id.* at Request No. 6. These Requests seek information relevant to Plaintiff's theory of economic duress: Defendants structured the PrudentRx Program to require targeted patients, including Plaintiff, to use CVS Specialty and give up their right to challenge unlawful practices at the risk of financial ruination or potentially deadly health complications.

### D. Defendants refuse to produce documents responsive to Plaintiff's Requests.

Caremark has produced 27 documents.[6] PrudentRx has produced 3.[7] None are relevant to whether Defendants structured the PrudentRx Program to coerce targeted patients like Plaintiff into agreeing to arbitrate through economic duress—the issue on which this Court has ordered discovery. Instead, Caremark contends that any documents relevant to whether "patients other than Plaintiff" can afford to rebuff the coercive structure of the PrudentRx Program are "beyond the scope of discovery ordered by the Court." *See* LaSalle Decl. Ex. C (Letter, A. Mittal to Pl.'s Counsel (Sept. 25, 2025)) at 3. PrudentRx has not responded to Plaintiff's latest letter seeking to resolve disputes, but its prior response stated that it, too, is limiting what it will search for to documents specific to Plaintiff, and not structural economic duress. *See* LaSalle Decl. Ex. D (Letter, L. Dalton to K. LaSalle (Sept. 19, 2025)) at 2.

---

[6] Nearly half of Caremark's produced documents are audio files of phone calls between Plaintiff and CVS Specialty occurring—as best Plaintiff can tell due to the absence of adequate metadata—after this case commenced. Most of the others do not mention arbitration at all. Two are Spanish-language forms, and at least one is just the image of an envelope. The remainder are unresponsive to Plaintiff's Requests and appear to be materials Defendants hope to sneak into a renewed argument against Plaintiff's ERISA claims.

[7] PrudentRx produced two audio files of conversations with Plaintiff and one form letter sent to her. None mention arbitration. PrudentRx has indicated that it will not produce any further materials at this stage of discovery.

Defendants' position suffers from a critical logical flaw: just because a document may also be relevant to other targeted patients does not mean it is irrelevant to Plaintiff. Documents weighing whether to impose generally applicable policies requiring the use of CVS Specialty—and the reasons to do so—are relevant to whether the structure of the PrudentRx Program led to Plaintiff's economic duress in agreeing to arbitrate. *Cf.* LaSalle Decl. Ex. B (Pl.'s RFPs) at Request No. 1. Analyses or discussions about whether the policy would make it unaffordable for targeted patients (including Plaintiff) to fill prescriptions elsewhere, leaving them no viable choice but to accept CVS Specialty's arbitration clause, are relevant to whether Plaintiff had any other viable alternative. *Cf. id.* at Request No. 3. And evidence Defendants discussed these issues—either internally, with each other, or with CVS Specialty—are relevant to whether they knew or intended the Program to coerce patients like Plaintiff into arbitrating. *Cf. id.* at Request No. 6.

### III.   ARGUMENT

Courts in this district recognize that, "[a]s a general matter, relevancy must be broadly construed . . . such that information is discoverable if there is any possibility it might be relevant . . . ." *Nat'l Liab. & Fire Ins. Co. v. Carman*, No. 17-cv-38, 2017 WL 11477214, at *1 (D.R.I., Dec. 12, 2017) (quoting *Fudge v. Time Warner Cable, Inc.*, No. 16-cv-11396, 2017 WL 2836992, at *3 (D. Mass. June 30, 2017)) (first alteration in *Carman*). Pursuant to Federal Rule of Civil Procedure 26(b)(1) the scope of what is relevant (and therefore discoverable) "is framed by the pleadings," along a plaintiff's responses to defense arguments such as a motion to compel arbitration. *Id.* A defendant may not evade its discovery obligations by "unilaterally attempting to limit the scope of discovery" and taking "an overly narrow view" of the issues. *S.E.C. v. McCabe*, No. 13-cv-161, 2014 WL 7405518, at *3 (D. Utah Dec. 30, 2014).

7

### A.    Plaintiff articulates a viable theory of economic duress under New York Law.

As the Second Circuit has explained, "[t]he doctrine of economic duress arises from the theory that the courts will not enforce an agreement in which one party has unjustly taken advantage of the economic necessities of another and thereby threatened to do an unlawful injury." *VVK Corp. v. Nat'l Football League*, 244 F.3d 114, 122 (2d Cir. 2001) (citations omitted). Under New York law, economic duress exists when there is "(1) a threat, (2) which was unlawfully made, and (3) caused involuntary acceptance of contract terms, (4) because the circumstances permitted no other alternative.'" *Kamerman v. Steinberg*, 891 F.2d 424, 431 (2d Cir. 1989).

Defendants made a threat. They force targeted patients like Plaintiff to use CVS Specialty under the threat of otherwise having to pay the full cost of their targeted medications—an amount that could easily exceed $200,000 a year. *See* Compl. ¶¶ 38, 59, 176; LaSalle Decl. Ex. A (CAREMARK-0000064–198) at -109. Defendants' threat is unlawful: federal health care laws prohibit Defendants from imposing such prohibitive costs on targeted patients and caps patient liability for healthcare-expense cost-sharing at a set amount (historically less than $10,000). *See id.* ¶¶ 42–44. Most patients cannot afford a $250 medication, let alone one that costs $200,000. *See id.* ¶ 53. So they are forced to accept CVS Specialty's Terms of Use, including its arbitration clause. These allegations satisfy New York's four-part economic duress standard.

Defendants resist discovery by adding a fifth, limiting element: that the circumstances leading to duress must be unique to Plaintiff. They argue that economic duress inquiries must focus on "the circumstances of the person raising the defense," and refuse to produce materials discussing, for example, general policies or analyses of a generic targeted patients' ability to afford punitive costs, because they relate to "patients other than Plaintiff." *See, e.g.*, LaSalle Decl. Ex. C (Letter, A. Mittal to Pl.'s Counsel (Sept. 25, 2025)) at 1–3; *accord id.* Ex. D (Letter, L. Dalton to K. LaSalle (Sept. 19, 2025)). Yes, these materials will be relevant to other targeted patients, but

8

they are *also* relevant to Plaintiff. There is no requirement under New York law that limits economic duress to circumstances where pressure is applied to one person and one person only: Defendants have cited no authority for this notion in the Parties' meet-and-confers, and Plaintiff has been unable to locate any.

To the contrary, courts applying New York law have credited defenses to a motion to compel arbitration based on generally applicable, structural features of the circumstances in which the "choice" was presented. In *Brennan v. Bally Total Fitness*, for example, the gym gave employees "no more than fifteen minutes to review a sixteen-page single-spaced document"; "threatened" employees that if they did not sign, they "would not be promoted"; and asked each employee "aloud" in front of coworkers whether they "had signed the [a]greement." 198 F. Supp. 2d 377, 383 (S.D.N.Y. 2002). These circumstances, the court found, "show that [the plaintiff] lacked a 'meaningful choice' when entering into the" agreement.[8] *Id.*

By reading a novel and improper limitation into New York law on economic duress, Defendants take "an overly narrow view" of the issues, *McCabe*, 2014 WL 7405518, at *3, which frustrates the very purpose of the Court's discovery Order: to test the factual basis for Plaintiff's claim of economic duress.

### B. The discovery sought in Requests Nos. 1, 3, and 6 are relevant to Plaintiff's theory of economic duress.

The Requests at issue in this motion seek information relevant to Plaintiff's contention that the PrudentRx Program's requirement that targeted patients use CVS Specialty and, therefore, that they forfeit their litigation rights. Specifically, they seek three kinds of information.

---

[8] The *Brennan* court discussed circumstances unique to the plaintiff herself only in dicta. *See id.* ("The significant disparity in bargaining power that existed between the parties *also* contributed to [the plaintiff's] lack of a meaningful choice in deciding whether the sign." (emphasis added)).

9

*Information concerning the PrudentRx Program's requirement that targeted patients like Plaintiff use CVS Specialty exclusively.* The disputed provisions of Request No. 1 seek "documents and communications" concerning insurance plans for which Defendants administer the PrudentRx Program that "discuss[] a requirement that [targeted patients] obtain [targeted medications] through CVS Specialty Pharmacy." *See* LaSalle Decl. Ex. B (Pl.'s RFPs) at Request No. 1. This includes "formularies" defining the breadth of the policy requiring the use of CVS Specialty, as well as any generally applicable "Policies" or other documents "discussing" the requirement and, specifically, "the price differential, and the reasons therefor," for a targeted medication obtained via CVS Specialty versus some other pharmacy. *Id.* These are materials of general applicability that are relevant to examining the systematic pressure to force targeted patients into using CVS Specialty and, by extension, forfeiting their litigation rights. And that systematic pressure has impacted Plaintiff as it has other targeted patients.

*Information concerning targeted patients' ability to afford using an alternative pharmacy.* The disputed provisions of Request No. 3 seek "documents and communications" concerning targeted medications' cost differences between CVS Specialty and other pharmacies, and in particular, "any Policy, analysis, study, report, or communication concerning the relationship of those costs to [targeted patients'] anticipated ability to afford" their prescriptions. *Id.* at Request No. 3. These are materials of general applicability relevant to examining the reason for the systematic pressure deployed to force patients into using CVS Specialty Pharmacy and whether Defendants considered (or intended) the impact on targeted patients' litigation rights. These policies and analyses would have examined the Program's effect on patients generally and thus are as relevant to Plaintiff as they are to other targeted patients.

***Information concerning Defendants' awareness of the effects of those costs on targeted patients.*** The disputed provisions of Request No. 6 seek similar information: "discussions by or among, or studies or analyses performed by, any Defendant concerning the cost of" targeted medications purchased from a source other than CVS Specialty, "including any discussion of [targeted patients'] ability to afford" those costs. *Id.* at Request No. 6. That is, Request No. 6 seeks information about Defendants' awareness or intention that the CVS-Specialty-only policy economically barred targeted patients from any alternative source of their medications—and thus left patients with no choice but to agree to CVS Specialty's Terms barring litigation.

These materials bear on the question on which the Court ordered discovery: whether Plaintiff was subject to economic duress when presented with CVS Specialty's Terms of Use.

**C.     Allowing Defendants to artificially narrow the scope of discovery will only increase the burdens to the Court and Plaintiff in the long run.**

Interests of efficiency counsel in favor of compelling production of the materials Plaintiff seeks. Even if Defendants could cabin discovery to materials relevant to Plaintiff and only Plaintiff, the Court should not permit them to do so. Plaintiff has articulated a generally applicable form of economic duress that impacts her and all other targeted patients. Those other targeted patients are Class members. *See* Compl. ¶ 25 (defining class). And while Plaintiff is not seeking discovery into circumstances impacting only absent class members, barring generally applicable discovery—as the Defendants have—will cause delays and inefficiencies later in this litigation.

Plaintiff raised the fact that the discovery Defendants resist would be relevant not only to Plaintiff, but to the entire Class in this case, and expressed concern that Defendants would "move to strike class allegations on the ground that Plaintiff has not established a class-wide theory of duress." LaSalle Decl. Ex. E, (Letter, K. LaSalle to Defense Counsel (Aug. 8, 2025)) at 3. PrudentRx has not responded to that concern at all; Caremark's response makes clear that it

11

anticipated further discovery on the matter at class certification. *See* LaSalle Decl. Ex. F (Letter A. Mittal to Pl.'s Counsel (Aug. 26, 2025)) at 2–3 ("To be clear, Caremark is focused solely on the limited discovery regarding *Plaintiff's* claim of economic duress that has been ordered by the Court. Should this case ever proceed to the point where the Court allows class discovery, Caremark is not taking—and will not take—the position that Plaintiff has missed her opportunity to take discovery on, and attempt to prove, a class-wide theory of duress."). Caremark's position would lead to delay and inefficiency.

Fortunately, the Court can head off any risk of gamesmanship—of Defendants limiting the scope of discovery, then moving to strike allegations on the basis of those unilaterally imposed limits—by compelling Defendants to produce generally applicable (not just Plaintiff-specific) materials relevant to structural coercion in response to Plaintiff's Requests. That discovery is not only relevant to Plaintiff's claims of economic duress, but to the economic duress experienced by the Class as a whole. Ordering this discovery will save the Parties and the Court time and effort later in this case.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court order Defendants to produce all documents responsive to Plaintiffs' Requests Nos. 1, 3, and 6.

Dated: October 3, 2025                                          Respectfully Submitted,

*s/ Kristie A. LaSalle*
Kristie A. LaSalle (admitted *pro hac vice*)
Stephen J. Teti (admitted *pro hac vice*)
**Lockridge Grindal Nauen PLLP**
265 Franklin Street, Suite 1702
Boston, MA 02110
Phone: (617) 535-3763
sjteti@locklaw.com
kalasalle@locklaw.com

Brian D. Clark (admitted *pro hac vice*)
David W. Asp (*pro hac vice* forthcoming)
Derek C. Waller (*pro hac vice* forthcoming)
Kira Q. Le (*pro hac vice* forthcoming)
**Lockridge Grindal Nauen PLLP**
100 Washington Ave S, Suite 2200
Minneapolis, MN 55401
Phone: (612) 339-6900
bdclark@locklaw.com
dwasp@locklaw.com
dcwaller@locklaw.com
kqle@locklaw.com

*Counsel for Plaintiff and
Interim Lead Class Counsel*


*s/ Stephen M. Prignano*
Stephen M. Prignano Bar No. 3649
**McIntyre Tate LLP**
50 Park Row West, Suite 109
Providence, RI 02903
(401) 351-7700
(401) 331-6095 (Fax)
sprignano@mcintyretate.com

*Interim Liaison Class Counsel*

13

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 3, 2025, this document, filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants.

                                           /s/*Kristie A. LaSalle*
                                           Kristie A. LaSalle