# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| SHEILA GLUESING, *individually and on behalf of all others similarly situated*,<br>　　　Plaintiff,<br><br>　　　v.<br><br>PRUDENTRX LLC, *a Florida Limited Liability Company*; and<br><br>CAREMARK RX LLC, *a Delaware Limited Liability Company*,<br>　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 24-cv-549-JJM-AEM |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Court Chief Judge.

Sheila Gluesing has filed a class action lawsuit against PrudentRx LLC ("PrudentRx") and Caremark Rx LLC ("Caremark") (collectively, "Defendants") under the Employee Retirement Income Security Act ("ERISA") and the Racketeer Influenced and Corrupt Organizations ("RICO") Act.  ECF No. 1.  She alleges that Defendants, along with CVS Specialty Pharmacy ("CVS Specialty"), engaged in a scheme to take copay assistance funds designed by drug manufacturers to help patients afford high-cost specialty prescription drugs and divert those funds to insurers rather than to the patients themselves, which resulted in the patients having to bear additional healthcare costs.  *Id.*  Defendants have now filed a Renewed

Motion to Compel Arbitration,[1] seeking to send Ms. Gluesing's claims into arbitration. ECF No. 63.[2] Ms. Gluesing has filed a Response In Opposition to Defendants' Motion. ECF No. 66.

For the reasons stated below, the Court GRANTS Defendants' Motion to Compel Arbitration and, as Defendants have requested, this case will be STAYED pending arbitration.

## I.    BACKGROUND

In considering Defendants' Renewed Motion to Compel Arbitration, the Court must "draw the relevant facts from the operative complaint and the documents submitted to the district court in support of the motion to compel arbitration." *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 55 (1st Cir. 2018) (citing *Gove v. Career Sys. Dev. Corp.*, 689 F.3d 1, 2 (1st Cir. 2012)).

Ms. Gluesing is a resident of Iowa who receives health insurance through Wellmark Health Plan of Iowa ("Wellmark"). ECF No. 1 at 6. Wellmark, in turn, contracts with Caremark for pharmacy benefit manager ("PBM") services. *Id.* As a PBM, Caremark negotiates with pharmacies to provide insurers (including both insurance companies and employers that sponsor health plans for their employees) with discounted prices (also known as "rebates") on prescription drugs. *Id.* at 2, 18.

---

[1] Defendants previously moved to compel arbitration on March 6, 2025. *See* ECF No. 21. However, the Court denied that motion without prejudice, permitted the parties to engage in "limited discovery on the issue of economic duress," and advised Defendants that they could later file a renewed motion to compel arbitration. *See* ECF No. 38.

[2] All citations to the parties' briefs and exhibits refer to each of the unsealed docket filings on ECF, as opposed to the sealed versions of those filings.

In addition, Caremark administers prescription benefits for those members enrolled in the insurers' health plans. *Id.* at 9, 18.

Wellmark also participates in the PrudentRx Copay Program (the "Program"), which was designed by PrudentRx. ECF No. 1 at 4, 7. For those patients enrolled in the Program, PrudentRx offers that "they will enjoy a $0 copay for their qualifying specialty medications." *Id.* at 28. PrudentRx operates the Program with Caremark and CVS Specialty. *Id.* at 13. PrudentRx also works with Caremark to market the Program to health plan sponsors and, once a sponsor agrees to join, the sponsor's "eligible members" are enrolled in the Program. *Id.* at 13, 28.

In March 2022, Ms. Gluesing was prescribed Dupixent, which is a medication used to treat atopic dermatitis and psoriasis. ECF No. 63 at 5 (citing ECF No. 63-6 [Ex. E, Mittal Decl.] at 3–4). Dupixent qualifies as a "specialty drug," which generally refers to a high-cost prescription medication used to treat complex and serious health conditions, such as cancer, multiple sclerosis, and autoimmune disorders. ECF No. 1 at 1–2.

As part of her health insurance plan with Wellmark, Ms. Gluesing "must purchase specialty drugs through the specialty pharmacy program" for those drugs to be covered by her insurance, and the "specialty pharmacy program is limited to CVS Specialty." ECF No. 63 at 5 (citing ECF No. 63-5 [Ex. D, Mittal Decl.] at 53). In addition, Ms. Gluesing is enrolled in the PrudentRx Copay Program through her Wellmark plan. ECF No. 1 at 7.

3

On April 1, 2022, as part of her preparations to fill her Dupixent prescription through CVS Specialty, Ms. Gluesing alleges that "a CVS Specialty online account was created using [her] email address." ECF No. 66 at 3. Ms. Gluesing states that she "does not recall creating the account," and she "believes her healthcare provider's office may have created the account for her[.]" *Id.* at 4.

As part of the CVS Specialty online account registration process, there is a webpage that asks users to click a box stating: "I agree to the CVS Specialty Terms and Conditions." ECF No. 63 at 6 (citing ECF No. 63-10 [Howell Decl.] at 2; ECF No. 63-13 [Ex. C, Howell Decl.] at 2). The words "CVS Specialty Terms and Conditions" contained a hyperlink to the full CVS Specialty Terms of Use ("CVS Specialty Terms" or "Terms") that were in effect in 2022. *Id.* The Terms then in effect contained a "Dispute Resolution" provision that states, in relevant part:

> EXCEPT FOR DISPUTES THAT QUALIFY FOR SMALL CLAIMS COURT, ALL DISPUTES ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY ASPECT OF THE RELATIONSHIP BETWEEN YOU, ON THE ONE HAND, AND CVS/SPECIALTY OR ITS SUPPLIERS OR VENDORS, ON THE OTHER HAND, WHETHER BASED IN CONTRACT, TORT, STATUTE, FRAUD, MISREPRESENTATION, OR ANY OTHER LEGAL THEORY, WILL BE RESOLVED THROUGH FINAL AND BINDING ARBITRATION BEFORE A NEUTRAL ARBITRATOR INSTEAD OF IN A COURT BY A JUDGE OR JURY AND YOU AGREE THAT CVS/SPECIALTY AND YOU ARE EACH WAIVING THE RIGHT TO TRIAL BY A JURY. YOU AGREE THAT ANY ARBITRATION UNDER THIS AGREEMENT WILL TAKE PLACE ON AN INDIVIDUAL BASIS; CLASS ARBITRATIONS AND CLASS ACTIONS ARE NOT PERMITTED AND YOU ARE AGREEING TO GIVE UP THE ABILITY TO PARTICIPATE IN A CLASS ACTION. The arbitration will be administered by the American Arbitration Association ("AAA") under its Consumer Arbitration Rules . . . as amended by this Agreement.

*Id.* (quoting ECF No. 63-14 [Ex. D, Howell Decl.] at 16).

Ms. Gluesing later discovered that certain drug manufacturers (such as the manufacturers of Dupixent) offer copay assistance programs that are designed to help patients afford expensive specialty drugs.  ECF No. 1 at 7, 21.  However, she alleges that the PrudentRx Copay Program diverts copay assistance program funds to insurers rather than to the patients themselves, which results in the patients having to bear additional healthcare costs.  *Id.* at 1.

On December 26, 2024, Ms. Gluesing brought ERISA and RICO claims on behalf of herself and on behalf of others similarly situated.  ECF No. 1 at 1.  She alleges that the PrudentRx Copay Program violates the Affordable Care Act ("ACA") because it "deprives patients of the benefits of patient copay assistance funding and increases patients' healthcare costs."  *Id.*  Specifically, Ms. Gluesing accuses Defendants and CVS Specialty of running a "fraudulent enterprise . . . to divert hundreds of millions, if not billions, of dollars in funding meant to help patients, to insurance plans and enrich themselves instead."  *Id.*  Defendants have responded by filing a Renewed Motion to Compel Arbitration.  ECF No. 63.

## II.    STANDARD OF REVIEW

The Federal Arbitration Act ("FAA") governs the Court's review of Defendants' Motion.  9 U.S.C. §§ 1–16.  "[T]he FAA requires courts to treat arbitration as 'a matter of contract' and enforce agreements to arbitrate 'according to their terms.'"  *Air-Con, Inc. v. Daikin Applied Latin Am., LLC*, 21 F.4th 168, 174 (1st Cir. 2021) (quoting *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 67 (2019)).  "Parties are not obliged to arbitrate, however, 'when they have not agreed to do so.'"  *Aldea-*

*Tirado v. PricewaterhouseCoopers, LLP*, 101 F.4th 99, 103 (1st Cir. 2024) (quoting

*Rivera-Colón v. AT&T Mobility P.R., Inc.*, 913 F.3d 200, 207 (1st Cir. 2019)).

Accordingly, the party "seeking to compel arbitration under the FAA must

demonstrate 'that a valid agreement to arbitrate exists, that the movant is entitled

to invoke the arbitration clause, that the other party is bound by that clause, and that

the claim asserted comes within the clause's scope.'" *Dialysis Access Ctr., LLC v.

RMS Lifeline, Inc.*, 638 F.3d 367, 375 (1st Cir. 2011) (quoting *InterGen N.V. v. Grina*,

344 F.3d 134, 142 (1st Cir. 2003)).

A motion to compel arbitration should be evaluated "against the summary

judgment standard to determine whether a genuine dispute of fact exists regarding

the parties' agreement to arbitrate." *Air-Con*, 21 F.4th at 176. In conducting this

review, the Court "construe[s] the record in the light most favorable to the non-

moving party and draw[s] all reasonable inferences in its favor." *Id.* at 175. "If the

non-moving party puts forward materials that create a genuine issue of fact about a

dispute's arbitrability, the district court 'shall proceed summarily' to trial to resolve

that question." *Id.* (quoting 9 U.S.C. § 4). That said, "[t]he non-moving party 'cannot

avoid compelled arbitration by generally denying the facts upon which the right to

arbitration rests; the party must identify specific evidence in the record

demonstrating a material factual dispute for trial.'" *Id.* at 175 n.8 (quoting *Soto v.

State Indus. Prods., Inc.*, 642 F.3d 67, 72 n.2 (1st Cir. 2011)).

6

## III.    DISCUSSION

In essence, Ms. Gluesing argues that Defendants' Renewed Motion to Compel Arbitration should be denied because: (1) no agreement to arbitrate was ever formed; (2) even if such an agreement was formed, it is invalid because she entered into it through economic duress; and (3) even if the agreement is valid, Defendants are not entitled to enforce it as nonsignatories (i.e., nonparties) to the agreement.  *See* ECF No. 66 at 10–30.  The Court addresses each argument in turn.

### A.    Through the CVS Specialty Terms, Ms. Gluesing Formed An Agreement to Arbitrate

#### 1.    New York Law Applies to This Analysis

In analyzing whether an agreement to arbitrate exists, the first step is to determine which law governs.  "[F]or the most part, general principles of state contract law control the determination of whether an agreement to arbitrate exists." *Nat'l Fed'n of the Blind v. The Container Store, Inc.*, 904 F.3d 70, 80 (1st Cir. 2018) (citing *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987)); *see also First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

With the apparent agreement of the parties, the Court will apply New York law. *See* ECF No. 63 at 11 ("The CVS Specialty Terms of Use select New York law."); ECF No. 66 at 11 (recognizing that New York state law governs contract formation). Like most other states, "[t]o form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) (quoting *Louros v. Cyr*, 175 F. Supp. 2d 497, 511 n.5 (S.D.N.Y. 2001)).

## 2.    The Type of Agreement Here Is a "Clickwrap" Agreement

The Court next discusses the type of contract that is at issue here.  This case involves an online contract, which applies the same principles of contract law as regular contracts.  *See, e.g.*, *Register.com*, 356 F.3d at 404 ("While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract.").

"Contracts formed on the Internet come primarily in two flavors: 'clickwrap' (or 'click-through') agreements . . . and 'browsewrap' agreements." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175–76 (9th Cir. 2014).[3]   A clickwrap agreement "presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating 'I agree' in order to proceed." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022) (citing *Nguyen*, 763 F.3d at 1175–76).[4]  By contrast, under a browsewrap agreement, "a website offers terms that are disclosed only through a hyperlink and the user supposedly manifests assent to those terms simply by continuing to use the website." *Id.* (citing *Nguyen*, 763 F.3d at 1176).  Whereas "courts have routinely found clickwrap agreements enforceable," they "are more reluctant to enforce browsewrap agreements because consumers are frequently

---

[3] Though *Nguyen* was decided by the Ninth Circuit, the court in that case applied New York law.  763 F.3d at 1175 ("[I]n evaluating the validity of Barnes & Noble's arbitration agreement, we apply New York law, to the extent possible.").

[4] Though the Ninth Circuit decided this case, like *Nguyen*, *Berman* involved the application of New York law.  30 F.4th at 855 (applying New York law, which "dictate[s] the same outcome" as California law "[i]n determining whether the parties have agreed to arbitrate a particular dispute").

8

left unaware that contractual terms were even offered, much less that continued use of the website will be deemed to manifest acceptance of those terms." *Id.*

While Ms. Gluesing contends that the agreement at issue here "constitute[s] [an] unenforceable browsewrap," ECF No. 66 at 13 n.8, that is plainly not so. As part of CVS Specialty's online registration process, users are prompted to click a box stating: "I agree to the CVS Specialty Terms and Conditions." ECF No. 63 at 6 (citing ECF No. 63-13 [Ex. C, Howell Decl.] at 2). The words "CVS Specialty Terms and Conditions" contain a hyperlink to the full CVS Specialty Terms then in effect. *Id.* The website looks something like this:



ECF No. 63-13 [Ex. C, Howell Decl.] at 2.  The crucial element here is the "I agree" box.  This signifies that the contract at issue here is a type of clickwrap agreement.  *See Berman*, 30 F.4th at 856.

### 3.   Ms. Gluesing Entered Into an Arbitration Agreement

The next question is whether Ms. Gluesing entered into an arbitration agreement.  Ms. Gluesing argues that she did not enter into such an agreement because "[t]here was no meeting of the minds," and "thus no mutual assent."  ECF No. 66 at 14.

Under New York law, "[t]he manifestation of mutual assent must be sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019) (citing *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 417 N.E.2d 541, 543 (N.Y. 1981); *Register.com*, 356 F.3d at 427).  "Generally, courts look to the basic elements of the offer and the acceptance to determine whether there was an objective meeting of the minds sufficient to give rise to a binding and enforceable contract." *Id.* (citing *Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999)).  "Where an offeree does not have *actual* notice of certain contract terms, [s]he is nevertheless bound by such terms if [s]he is on *inquiry* notice of them and assents to them through conduct that a reasonable person would understand to constitute assent." *Id.* (emphasis in original) (citing *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 120 (2d Cir. 2012)).

Here, as mentioned, CVS Specialty's Terms are available via hyperlinked "CVS Specialty Terms and Conditions" language found on the company's online registration page. ECF No. 63 at 4. At their outset, the CVS Specialty Terms contain language alerting users—in bold and capital letters—that "**THIS AGREEMENT CONTAINS A MANDATORY ARBITRATION OF DISPUTES PROVISION**[.]" ECF No. 75 at 3 (quoting ECF No. 63-14 [Ex. D, Howell Decl.] at 3).

It is permissible for arbitration agreements to be contained within hyperlinked terms and conditions, so long as users are put on reasonable notice of the hyperlinked terms. *See Berman*, 30 F.4th at 857. To be sure, neither party here seems to suggest that Ms. Gluesing had actual notice of the arbitration agreement. *See* ECF No. 63 at 12; ECF No. 66 at 18. Instead, Defendants' theory of the case is that Ms. Gluesing was on inquiry notice of the agreement. ECF No. 63 at 12. Thus, "on a motion to compel arbitration," courts will find an arbitration agreement to exist under an inquiry notice theory "where [(1)] the notice of the arbitration provision was reasonably conspicuous and [(2)] manifestation of assent [is] unambiguous as a matter of law." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 76 (2d Cir. 2017).[5]

### a. Reasonably Conspicuous Notice

As to the first element of inquiry notice, "[a] reasonably prudent internet or smartphone user is on inquiry notice of contractual terms where the terms are

---

[5] *Meyer* was a case involving California state law, but the Second Circuit "note[d] that New York and California apply 'substantially similar rules for determining whether the parties have mutually assented to a contract term.'" 868 F.3d at 74 (quoting *Schnabel*, 697 F.3d at 119).

presented in a clear and conspicuous way." *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 704 (2d Cir. 2023).[6]  To be conspicuous, notice "must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Berman*, 30 F.4th at 856.

To be clear, this part of the analysis does not ask whether Ms. Gluesing *herself* was on inquiry notice of the arbitration agreement.  Rather, it asks whether the "reasonably prudent Internet user" would have been.[7] *Berman*, 30 F.4th at 856.  This determination requires a "look to the design and content of the relevant interface to determine if the contract terms were presented to the offeree in [a] way that would put her on inquiry notice of such terms." *Starke*, 913 F.3d at 289 (internal citations omitted).  There are numerous design characteristics that New York courts look to in making this determination:

- Whether the relevant screen is "uncluttered" with only a few items, such as fields for registration or payment information and the notice and hyperlinked terms, or is "cluttered" with extraneous information, unrelated hyperlinks, text displayed in various font sizes and colors, or multiple buttons and promotional advertisements;

---

[6] Though the district court in *Edmundson* applied Connecticut law on the question of contract formation, *see Edmundson v. Klarna, Inc.*, 642 F. Supp. 3d 256, 265–66 (D. Conn. 2022), the Second Circuit on appeal observed that "traditional contract formation law does not vary meaningfully from state to state" and, in fact, Connecticut, California, and New York "apply substantially similar rules for determining whether the parties have mutually assented to a contract term." *Edmundson*, 85 F.4th at 702–03 (citing *Schnabel*, 697 F.3d at 119; *Meyer*, 868 F.3d at 74).

[7] The "reasonably prudent user," as the Second Circuit has come to define the term, "is not a complete stranger to computers or smartphones, having some familiarity with how to navigate to a website or download an app." *Edmundson*, 85 F.4th at 704 (internal citations omitted).

- Whether notice and hyperlinked terms are conspicuous in light of the whole web page, particularly given the capitalization, bolding, underlining, sizing, and font choice;
- Whether the entire screen, including the notice and hyperlinked terms, is visible at once without need for a "user to scroll beyond what is immediately visible;" and
- Whether the notice and hyperlinked terms are temporally and "spatially coupled with the mechanism for manifesting assent."

*Hu v. Whaleco, Inc.*, 779 F. Supp. 3d 265, 285–86 (E.D.N.Y. 2024) (citing *Edmundson*, 85 F.4th at 705–07; *Starke*, 913 F.3d at 290–92; *Meyer*, 868 F.3d at 78–82; *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 233–38 (2d Cir. 2016)).

Starting with the first criterion, the registration page appears "uncluttered" because it presents users with a single field to enter a password (as well as another field confirming the password), a box to click in which users indicate that they agree to the CVS Specialty Terms and Conditions, a hyperlink to those terms and conditions, and a button to press to "Complete Registration." *Compare Edmundson*, 85 F.4th at 705, 712 (finding the interface was "uncluttered" because "the only link provided [was] to [the defendant]'s terms, and the user [was] presented with only one button to click — that is, selecting 'Confirm and continue'"), *with Nicosia*, 834 F.3d at 237–38, 241 (holding that "reasonable minds could disagree on the reasonableness of notice" when the interface contained "between fifteen and twenty-five links," "various text . . . in at least four font sizes and six colors (blue, yellow, green, red, orange, and black), alongside multiple buttons and promotional advertisements," and "the customers' personal address, credit card information, shipping options, and purchase summary").

Second, the hyperlinked CVS Specialty Terms are sufficiently "conspicuous." *See Hu*, 779 F. Supp. 3d at 286. "[W]hile it is permissible to disclose terms and conditions through a hyperlink, the fact that a hyperlink is present must be readily apparent." *Berman*, 30 F.4th at 857. A website designer must do more than "[s]imply underscoring words or phrases . . . to alert a reasonably prudent user that a clickable link exists." *Id.* The hyperlink at issue here is underlined, in all caps, accompanied by an asterisk, and in a black font that is the same size as—but clearly contrasts against—the other, lighter gray and bolded fonts appearing on the registration page. *See, e.g.*, *Hu*, 779 F. Supp. 3d at 290 ("The hyperlink to the Terms is bolded, in a dark gray font, and in a font size similar to surrounding text, and there are few conflicting colors on the Registration Screen, as the color scheme is essentially black, white, and gray, with a single orange bar indicating where a user should click to continue."); *Peni v. Daily Harvest, Inc.*, No. 22-cv-5443, 2022 WL 16849451, at *4 (S.D.N.Y. Nov. 10, 2022) (finding that the gray text warning — "[b]y clicking above, you agree to our Terms of Use and Terms of Sale, and consent to our Privacy Policy" — was reasonably conspicuous because, among other things, the "dark" text was "set off from the light background and [was] written in a font roughly the same size as that of the primary text on the page"); *Feld v. Postmates, Inc.*, 442 F. Supp. 3d 825, 831 (S.D.N.Y. 2020) ("That the notice and hyperlinks are in a smaller font size does not render the disclaimer inconspicuous; the grey and black color contrast against the white background and are clear to the reasonably prudent user creating an account. The hyperlinks to the [Terms of Service] and Privacy Policy are in a darker, bolder font

14

than the rest of the text, signifying to a reasonably prudent use that these would be clickable terms.").

Third, the website's hyperlink is "visible at once," and there is no need for a "user to scroll beyond what is immediately visible." *See Hu*, 779 F. Supp. 3d at 286; *cf. Nguyen*, 763 F.3d at 1177 ("Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the [ ] agreement."); *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 23, 31–32 (2d Cir. 2002) (holding that a reasonably prudent user would not have known of terms that were visible only if the user "happen[ed] to scroll down" to the bottom of the webpage).

Fourth and finally, the hyperlinked terms "are temporally and 'spatially coupled with the mechanism for manifesting assent.'" *Hu*, 779 F. Supp. 3d at 286. Here, the "CVS Specialty Terms and Conditions" hyperlink is placed directly next to a box that users are prompted to click to indicate agreement with such Terms. This hyperlink also appears above a red button labeled "Complete Registration," which signifies that CVS Specialty's Terms and Conditions are "coupled with the mechanism for manifesting assent — i.e., the register button." *Meyer*, 868 F.3d at 78; *see also Peni*, 2022 WL 16849451, at *4 ("The button is also temporally coupled with the terms because the terms are presented as a user is signing up for a[n] . . . account."); *Feld*, 442 F. Supp. 3d at 831 ("The notice and the sign-up options are also 'temporally coupled,' i.e., the notice appears at the time of account creation, such that

15

[a] 'reasonably prudent . . . user would understand that the terms were connected to the creation of a user account.'").

Accordingly, because CVS Specialty's online registration page appears uncluttered, is visible at once, and contains a hyperlink that is reasonably conspicuous and spatially and temporally coupled with the user's mechanism for manifesting assent, the Court concludes that this page provides users with "reasonably conspicuous notice" of CVS Specialty's Terms. *See Hu*, 779 F. Supp. 3d at 285–86.

### b.   Unambiguously Manifested Assent

The Court next turns to the second element of inquiry notice, which is unambiguously manifested assent. Unlike the first element, this element does consider Ms. Gluesing's individual circumstances. With respect to online agreements, "courts regularly find unambiguously manifested assent due to two 'defining features': 'the forced confrontation with the terms' and 'the forced decision to accept or reject them by clicking a button.'" *Open Book Theatre Co. v. Brown Paper Tickets, LLC*, 749 F. Supp. 3d 1076, 1084 (S.D. Cal. 2024) (quoting *Wilson v. Playtika, Ltd.*, 349 F. Supp. 3d 1028, 1037 (W.D. Wash. 2018)); *see also Meyer*, 868 F.3d at 75 ("'Courts around the country have recognized that [an] electronic 'click' can suffice to signify the acceptance of a contract.'" (quoting *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033–34 (7th Cir. 2016))).

At first glance, this analysis does not appear to require much heavy lifting. The two defining features of unambiguously manifested assent seem to both be

present here. *See Open Book Theatre Co.*, 749 F. Supp. 3d at 1084. As mentioned, just before users can finish creating their online account, CVS Specialty's website prompts them to click a box stating: "I agree to the CVS Specialty Terms and Conditions." ECF No. 63 at 6. The words "CVS Specialty Terms and Conditions" also contain a hyperlink, leading to the full CVS Specialty Terms in effect in 2022. *Id.* There is no dispute that the box was clicked and that an online account was registered under Ms. Gluesing's email address. *See* ECF No. 63 at 6 ("From a technical perspective, a person cannot create an online account with CVS Specialty Pharmacy without checking the box agreeing to the CVS Specialty Terms of Use."); ECF No. 66 at 3 ("On April 1, 2022, a CVS Specialty online account was created using Plaintiff's email address.").

Yet Ms. Gluesing contends that she does not recall creating a CVS Specialty account, and thus she does not recall clicking "I agree to the CVS Specialty Terms and Conditions." ECF No. 66 at 4. Instead, Ms. Gluesing suggests that "her healthcare provider's office may have created the account for her as part of its preparations for her to fill prescriptions through CVS Specialty." *Id.* In essence, Ms. Gluesing appears to argue that there is a genuine dispute over whether she manifested assent to be bound by CVS Specialty's Terms.

As Defendants correctly point out, however, Ms. Gluesing's lack of recall is insufficient to create a genuine dispute of material fact. ECF No. 75 at 5–10. New York courts have long recognized, particularly in the arbitration context, that it is not enough for an individual to claim that they do not remember entering into an

17

agreement. *See, e.g., Kutluca v. PQ N.Y. Inc.*, 266 F. Supp. 3d 691, 701 (S.D.N.Y. 2017) ("[F]ailing memories do not absolve a party from its contractual obligations . . . or create a triable issue of fact." (internal citations omitted)); *Whitaker v. Amazon.com Servs. LLC*, No. 22-cv-10222 (ALC), 2024 WL 1076521, at *4 (S.D.N.Y. 2024) (same). Indeed, Ms. Gluesing's own statements "that she cannot recall [entering into] an agreement . . . fails to create a triable issue of fact." *Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 51 (2d Cir. 2022) (internal citations omitted).

Ms. Gluesing may of course present other evidence to show that she did not create her CVS Specialty online account. "In reviewing motions to compel arbitration, just as for motions for summary judgment, a court must 'consider all relevant, admissible evidence submitted by the parties and contained in pleadings depositions, answers to interrogatories, and admissions on file, together with affidavits.'" *Barrows*, 36 F.4th at 50 (quoting *Nicosia*, 834 F.3d at 229). Ms. Gluesing purports to do so by pointing to her own deposition transcript in which she stated that her provider promised to handle all administrative matters, including "get[ting her] set up with the specialty pharmacy." ECF No. 66 at 19 (quoting ECF No. 66-2 [Ex. 1, Gluesing Tr.] at 46:8–47:5). In addition, she references deposition testimony in which she stated that, while the CVS Specialty online account was created on April 1, 2022, she did not download the CVS Specialty app onto her phone until April 10, 2022. *Id.* (citing ECF No. 66-2 [Ex. 1, Gluesing Tr.] at 143:10–21). Ms. Gluesing also directs the Court's attention to a screenshot taken on her phone to indicate that she downloaded the app on April 10, 2022. *Id.* at 4 (citing ECF No. 66-8 [Ex. 7] at 2).

This also fails to create a material factual dispute.  For one thing, the alleged statements from Ms. Gluesing's provider constitutes hearsay—that is, her relaying what her prescriber said—and such a statement is not properly considered on a motion to compel arbitration, which again follows the summary judgment standard. *See Davila v. Corporacion De P.R. Para La Difusion Publica*, 498 F.3d 9, 17 (1st Cir. 2007) ("It is black-letter law that hearsay evidence cannot be considered on summary judgment.").  Perhaps it would have been a different story if Ms. Gluesing's provider had "signed an affidavit or [given] a deposition in which the contents" of the conversation with Ms. Gluesing were disclosed.  *Id.*  But Ms. Gluesing points to no such affidavits or depositions in the record.

The phone screenshot does not do her any favors either.  Ms. Gluesing submits that she could not have possibly created the CVS Specialty online account on April 1, 2022 because she did not download the CVS Specialty app to her phone until April 10, 2022.  But this merely presumes in a conclusory fashion that the *only* way to have created an account was by using the CVS Specialty app.  *See Barrows*, 36 F.4th at 51 ("A party 'normally does not show the existence of a genuine issue of fact . . . merely by making assertions that are based on speculation or are conclusory.'" (quoting *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021)).  However, as Defendants point out, it is possible for users to create CVS Specialty online accounts on their web browsers, and it is not necessary for them to use the CVS Specialty app to do so.  *See* ECF No. 63 at 6, 13.

19

Defendants have also submitted ample evidence to support the conclusion that Ms. Gluesing created the online account. *See* ECF No. 75 at 9. This evidence includes: (1) "Caremark's business records showing that a CVS Specialty online account was created using [Ms. Gluesing's] email address and a password specified by the account creator on April 1, 2022," *id.* (citing ECF No. 63-11 [Ex. A, Howell Decl.] at 3; ECF No. 63-13 [Ex. C, Howell Decl.] at 2); (2) "an email that [Ms. Gluesing] received on April 1, 2022, thanking her 'for creating an account on CVSspecialty.com,'" *id.* (citing ECF No. 63-7 [Ex. F, Mittal Decl.] at 2 ("Dear SHEILA, Thank you for creating an account on CVSspecialty.com.")); and (3) "the fact that [Ms. Gluesing] thereafter used her online account more than 35 times to fill her prescription at CVS Specialty Pharmacy, which would require her to log in to the account using the email and created password," *id.* (citing ECF No. 63-15 [Ex. E, Howell Decl.] at 3).[8]

Ms. Gluesing's version of events also raise several implausibilities. *See Barrows*, 36 F.4th at 51 (advising courts that "where the facts alleged in a nonmovant's declaration are so contradictory that doubt is cast upon their plausibility, then absent other evidence, granting the motion to compel may be

---

[8] Defendants also submitted other evidence that is the subject of Ms. Gluesing's Motion to Preclude and Strike Defendant Caremark's Undisclosed Evidence Under Rule 37(c)(1). *See* ECF No. 68. In essence, Ms. Gluesing faults Defendants for failing to timely disclose certain evidence related to the creation of the CVS Specialty online account, and she seeks to strike this evidence. *Id.* The Court does not and need not consider that evidence because it finds that Defendants have produced ample other evidence to support a finding that Ms. Gluesing created the CVS Specialty online account. As such, Ms. Gluesing's Motion is DENIED as moot. ECF No. 68.

appropriate" (internal quotation marks and citations omitted)).   It seems highly unlikely, for instance, that a medical provider would create an online account for Ms. Gluesing using her email address, come up with a unique password for her, and then provide her with such login details so that Ms. Gluesing could proceed to access her online account more than thirty-five times over a period of years.

In sum, Ms. Gluesing's statements "that she cannot recall [entering into] an agreement . . . fail[ ] to create a triable issue of fact," especially given the evidence Defendants present to show that Ms. Gluesing did in fact create a CVS Specialty online account.  *See Barrows*, 36 F.4th at 51 (2d Cir. 2022); *see also Houtchens v. Google LLC*, 649 F. Supp. 3d 933, 942 (N.D. Cal. 2023) ("Google has offered evidence that Plaintiffs checked a box agreeing to Fitbit's Terms of Service when they created their Fitbit accounts.  Plaintiffs' bare assertion that they do not recall this process does not overcome . . . Google's evidence.").  The Court therefore finds that Ms. Gluesing has unambiguously manifested assent to CVS Specialty's Terms.

***

Accordingly, because CVS Specialty provides reasonably conspicuous notice of its arbitration agreement and because Ms. Gluesing unambiguously manifested assent to that agreement, the Court finds that Ms. Gluesing formed a valid arbitration agreement with CVS Specialty.  *See Meyer*, 868 F.3d at 76.

### B.    The CVS Specialty Terms Delegated the Issue of Economic Duress to an Arbitrator

#### 1.    By Incorporating the AAA Rules, the CVS Specialty Terms Delegated Questions of Arbitrability to an Arbitrator

21

Having determined that an arbitration agreement exists, the next question is whether Ms. Gluesing "agreed to arbitrate issues of arbitrability, including the validity and scope of the arbitration agreement." *Toth v. Everly Well, Inc.*, 118 F.4th 403, 410 (1st Cir. 2024). Defendants argue that the Court need not answer this question because the CVS Specialty Terms contain a delegation clause, which delegates this issue to an arbitrator to decide. ECF No. 63 at 14.

For context, a delegation clause is essentially "an agreement to submit to arbitration those issues relating to the scope, validity, and enforceability of an arbitration agreement." *Toth*, 118 F.4th at 410 (1st Cir. 2024) (citing *First Options*, 514 U.S. at 942). With a delegation clause, parties may delegate "questions of arbitrability" to an arbitrator, so long as there is "clear and unmistakable" evidence of the delegation. *Henry Schein*, 586 U.S. at 69 (citing *First Options*, 514 U.S. at 944). "When the parties' contract delegates [an] arbitrability question to an arbitrator, . . . a court possesses no power to decide [that] arbitrability issue." *Id.* at 68.

Defendants here assert—and Ms. Gluesing does not dispute—that the CVS Specialty Terms incorporate the Consumer Arbitration Rules of the American Arbitration Association ("AAA"). ECF No. 63 at 15 (citing ECF No. 63-14 [Ex. D, Howell Decl.] at 16 ("The arbitration will be administered by the [AAA] under its Consumer Arbitration Rules . . . as amended by this Agreement.")). Critically, the First Circuit has made clear that "incorporation of the AAA arbitration rules constitutes clear and unmistakable evidence of the parties' intent to delegate

22

arbitrability issues to the arbitrator." *Bossé v. N.Y. Life Ins.*, 992 F.3d 20, 29 (1st Cir. 2021) (citing *Awuah v. Coverall N. Am., Inc.*, 554 F.3d 7, 11-12 (1st Cir. 2009)).

Indeed, the AAA rules "provide that the arbitrator *must* hear any 'objections with respect to the existence, scope, or validity of the arbitration agreement,'" as well as objections "'to the arbitrability of any claim or counterclaim.'" *Toth*, 118 F.4th at 414 (emphasis added) (quoting Com. Arb. Rules & Mediation Procs. R-7(a) (2013)). This necessarily encompasses Ms. Gluesing's ERISA and RICO claims, meaning that an arbitrator must hear those claims. But does this delegation also encompass her economic duress argument such that the arbitrator must hear it?

### 2. Economic Duress Is a Question of Arbitrability for an Arbitrator to Decide

According to Ms. Gluesing, "no agreement was ever formed between [her] and CVS Specialty" because "the pharmacy structured its Terms to coerce patients like [her] into agreeing to the terms through economic duress."[9]    ECF No. 66 at 10. Defendants counter that Ms. Gluesing's economic duress argument is not a challenge to the arbitration agreement's *formation*, but that it is instead a challenge to the

---

[9] In her initial Response to Defendants' Motion to Compel Arbitration, Ms. Gluesing also argued that "CVS Specialty Pharmacy's purported arbitration agreement is unenforceable because it is unconscionable." ECF No. 24 at 21. Yet Ms. Gluesing does not appear to press the unconscionability argument in her renewed Response. To the extent that she does, unconscionability claims, like economic duress claims, are challenges to contract validity as opposed to contract formation. *See Wu v. Uber Techs., Inc.*, 260 N.E.3d 1060, 1077 (N.Y. 2024). And Ms. Gluesing's challenge appears to be one to the entire contract as opposed to its delegation provision, thereby rendering it a question of arbitrability. ECF No. 66 at 20 ("[A]ny such *agreement* would be . . . unconscionable." (emphasis added)); *see Toth*, 118 F.4th at 410 (holding that challenges to the validity of the entire contract, as opposed to the validity of a delegation provision, are for arbitrators to decide).

arbitration agreement's *validity*. ECF No. 75 at 21. This is an important distinction because, although disputes "concern[ing] contract formation . . . [are] generally for courts to decide," *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010), courts may only decide certain disputes relating to an arbitration agreement's validity. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006).

Indeed, the Supreme Court has differentiated between "two types of challenges to the validity of arbitration agreements: (1) challenges to the validity of an entire contract which contains an arbitration clause, and (2) challenges to the validity of the specific agreement to resolve the dispute through arbitration." *Farnsworth v. Towboat Nantucket Sound, Inc.*, 790 F.3d 90, 96 (1st Cir. 2015) (citing *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010); *Buckeye Check Cashing*, 546 U.S. at 444). "In a line of cases . . ., the Court has held that challenges of the first type are for the arbitrator to decide, whereas challenges of the second type are for the courts to decide, if timely and properly made." *Id.* (citing *Rent-A-Center*, 561 U.S. at 70–71; *Buckeye Check*, 546 U.S. at 444–45; *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967)).[10]

Where, as here, a party is subject to a delegation clause, they are somewhat limited in the types of challenges they may bring against an arbitration agreement.

---

[10] The Supreme Court has referred to this as the "severability" doctrine, *see Prima Paint*, 388 U.S. at 402–04, which "requires that challenges to the enforceability of the parties' agreement as a whole rather than [those] specifically directed at the agreement to arbitrate go to an arbitrator." *Nat'l Fed'n of the Blind*, 904 F.3d at 81 n.15. In essence, the severability doctrine "creates a legal fiction in which the arbitration agreement is a separate or separable contract from the underlying contract that is being challenged." *Id.* (citing *Prima Paint*, 388 U.S. at 402–04).

The FAA treats delegation clauses "like any other arbitration agreement." *Toth*, 118 F.4th at 410 (citing *Bossé*, 992 F.3d at 27 n.7). "[A]bsent a successful challenge to the delegation provision, courts must send all arbitrability disputes to arbitration." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 152 (2024). As such, this leaves the party opposing arbitration with only two viable options: (1) they may "challenge the formation of the contract"; or (2) they may challenge "the specific validity of the delegation provision." *Toth*, 118 F.4th at 410 (citing *Rent-A-Center*, 561 U.S. at 71).

Here then, the Court must answer the following questions. First, is economic duress a question of contract formation or contract validity? And second, if it is a question of contract validity, is Ms. Gluesing's challenge to the validity of the *entire* contract or a challenge *specifically* to the validity of the delegation provision?

### a.    Economic Duress Is a Question of Contract Validity

As to the first question, the First Circuit has said that "[o]ne could challenge the formation of a contract by claiming one of the essential elements . . . is missing" or "by showing that one party never agreed to the terms of the contract, that a signatory did not possess the authority to commit the principal, or that the signor lacked the mental capacity to assent." *Nat'l Fed'n of the Blind*, 904 F.3d at 81 (internal citations omitted). "On the other hand, a challenge to validity requires consideration of the enforceability of the agreement and if it is void or voidable." *Id.* (citing *Granite Rock Co.*, 561 U.S. at 301; *Buckeye*, 546 U.S. at 448–49). "Like formation, this challenge requires a look at relevant state law." *Id.* (citing *Perry*, 482 U.S. at 492 n.9).

25

New York courts have been clear on this issue.  They have recognized that "[e]conomic duress is an affirmative defense to a contract cause of action, making the alleged contract *voidable*." *Finserv Comput. Corp. v. Bibliographic Retrieval Servs., Inc.*, 509 N.Y.S.2d 187, 188–89 (N.Y. App. Div. 1986) (emphasis added) (citing *Stewart M. Muller Constr. Co., Inc. v. N.Y. Tel. Co.*, 359 N.E.2d 328, 328 (N.Y. 1976) ("A contract may be voided on the ground of economic duress where the complaining party was compelled to agree to its terms by means of a wrongful threat which precluded the exercise of its free will.")); *see also Dairy King, Inc. v. Boar's Head Provisions Co., Inc.*, 252 N.Y.S.3d 585, 590 (N.Y. App. Div. 2026) ("Economic duress 'permits a complaining party to void a contract and recover damages when it establishes that it was compelled to agree to the contract terms because of a wrongful threat by the other party which precluded the exercise of its free will.'" (quoting *805 Third Ave. Co. v. M.W. Realty Assocs.*, 448 N.E.2d 445, 451 (N.Y. 1983))).

Accordingly, because Ms. Gluesing's economic duress argument contemplates rendering her agreement with CVS Specialty voidable, the Court finds that it is a challenge to the validity—not the formation—of the agreement.  *See Nat'l Fed'n of the Blind*, 904 F.3d at 81; *Finserv Comput. Corp.*, 509 N.Y.S.2d at 188–89; *Dairy King*, 252 N.Y.S.3d at 590.

> **b.**  **Ms. Gluesing's Economic Duress Argument Is a Challenge to the Validity of the Entire Contract, and It Must Be Heard by an Arbitrator**

As to the second question, it is clear that Ms. Gluesing's economic duress argument is a challenge to her contract with CVS Specialty as a whole.  She refers to her challenge as "*structural* economic duress."  ECF No. 66 at 16 (emphasis added).

She contends that CVS Specialty "*structured* its Terms to coerce patients like [her] into agreeing to the terms through economic duress," and adds that "[she]—and all putative class members—have no choice but to fill their prescriptions for their targeted medications through CVS Specialty." *Id.* at 10, 12 (emphasis added).

This language reveals that Ms. Gluesing is challenging "the *entire agreement*," that is, the entirety of CVS Specialty's Terms, as structurally coercive. *Rent-A-Center*, 561 U.S. at 73 (emphasis in original). However, she does not raise a specific challenge to CVS Specialty's delegation clause itself. *See id.* This is ultimately fatal to her position.

Because Ms. Gluesing challenges the entirety of CVS Specialty's Terms as structurally coercive, the Court concludes that this issue is for an arbitrator to decide. *See Toth*, 118 F.4th at 410; *Rent-A-Center*, 561 U.S. at 71.

## C.    Defendants May Enforce the Arbitration Agreement Under a Third-Party Beneficiary Theory

Finally, the Court considers whether Defendants—even as nonsignatories to CVS Specialty's arbitration agreement—are entitled to enforce that agreement against Ms. Gluesing. In answering this question, there are two ancillary questions that the Court must answer: (1) whether the Court or an arbitrator must decide whether Defendants are entitled to nonsignatory enforcement of CVS Specialty's arbitration agreement; and (2) whether Defendants are in fact entitled to nonsignatory enforcement under a third-party beneficiary theory.

### 1.    This Court—As Opposed to an Arbitrator—Must Decide Whether Defendants Can Invoke CVS Specialty's Arbitration Agreement

27

Recall that the party seeking to compel arbitration bears the burden of proving that they are "'entitled to invoke the arbitration clause.'" *Dialysis Access Ctr.*, 638 F.3d at 375 (quoting *InterGen*, 344 F.3d at 142).  Defendants here concede that they are  nonsignatories to CVS Specialty's Terms. *See* ECF No. 63 at 18–22; ECF No. 75 at 13 ("As set forth in the Renewed Motion, Defendants have the right to compel arbitration under the CVS Specialty Terms of Use as non-signatories[.]").  As such, there is a dispute over whether Defendants can invoke CVS Specialty's arbitration agreement.  Nonetheless, as with economic duress, Defendants contend that this dispute is not for the Court to resolve, and that it is instead something that an arbitrator must decide.  ECF No. 63 at 18.  That is so, according to Defendants, because of the delegation clause contained within CVS Specialty's Terms.  *Id.*

The Court disagrees.  Ordinarily speaking, whether a party to a contract can enforce an arbitration agreement is a "threshold" or "gateway" question of arbitrability that can be delegated to an arbitrator to decide. *See Rent-A-Center*, 561 U.S. at 68.  However, just last year, the First Circuit recognized that nonsignatory enforcement of a delegation clause differs from "an ordinary case" involving two signatories to an agreement. *Morales-Posada v. Cultural Care, Inc.*, 141 F.4th 301, 309 (1st Cir. 2025).  The court observed that, "as a general rule, contractual agreements bind only the parties to the agreement and may be enforced only by those parties," and that "'a contract does not grant enforceable rights to nonsignatories.'" *Id.* at 309–10 (citing *McCarthy v. Azure*, 22 F.3d 351, 362 (1st Cir. 1994)).

28

Thus, to "overcome" this general rule, a nonsignatory "must *first* establish [its] right to enforce a delegation clause through one or more of the 'traditional principles' of contract law that permit nonsignatory enforcement." *Sheet Metal Workers Loc. No. 20 Welfare & Benefit Fund v. CVS Pharmacy, Inc.*, Nos. 16-cv-046-JJM-PAS, 16-cv-447-JJM-PAS, 2026 WL 278704, at *6 (D.R.I. Feb. 3, 2026) (emphasis in original) (quoting *Morales-Posada*, 141 F.4th at 309–10). Such "traditional principles" include "assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel." *Morales-Posada*, 141 F.4th at 309–10 (quoting *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009)). "And whether a nonsignatory . . . can make this showing is squarely an issue for this Court, rather than an arbitrator, to decide." *Sheet Metal Workers*, 2026 WL 278704, at *6 (citing *Morales-Posada*, 141 F.4th at 311).[11]

Thus, this Court—as opposed to an arbitrator—will decide whether Defendants are entitled to enforce CVS Specialty's arbitration agreement as nonsignatories to the agreement.

### 2. Defendants Are Third-Party Beneficiaries That Are Entitled to Invoke CVS Specialty's Arbitration Agreement

---

[11] Defendants disagree with the First Circuit's holding in *Morales-Posada* and note that other circuits require the arbitrator to decide the issue of nonsignatory enforcement. ECF No. 63 at 18 & n.7 (citing *Zirpoli v. Midland Funding, LLC*, 48 F.4th 136, 144 (3d Cir. 2022); *Casa Arena Blanca LLC v. Rainwater by Est. of Green*, No. 21-2037, 2022 WL 839800, at *3 (10th Cir. Mar. 22, 2022); *Swiger v. Rosette*, 989 F.3d 501, 507 (6th Cir. 2021); *Eckert/Wordell Architects, Inc. v. FJM Props. of Willmar, LLC*, 756 F.3d 1098, 1100 (8th Cir. 2014)). Of course, whatever the merits of this debate, "in the absence of a squarely binding Supreme Court decision mandating a divergence, it is not within the authority of a district court to blaze trails contrary to existing First Circuit precedent." *Cox v. City of Boston*, No. 22-110009-RGS, 2024 WL 4608587, at *2 (D. Mass. Oct. 29, 2024).

29

The next question is whether Defendants have met their burden of establishing that one of the "'traditional principles' of contract law permit[ting] nonsignatory enforcement" applies to them. *Morales-Posada*, 141 F.4th at 309–10 (quoting *Arthur Andersen*, 556 U.S. at 631). According to Defendants, they can satisfy their burden through equitable estoppel and third-party beneficiary theories. ECF No. 63 at 18–22; ECF No. 75 at 13. The Court focuses its analysis on Defendants' invocation of the third-party beneficiary theory.

Both parties agree that New York law applies to this part of the analysis. ECF No. 63 at 21–22; ECF No. 66 at 24–25. Indeed, the Supreme Court has instructed that whether a contract may be enforced by a nonparty through "third-party beneficiary theories" is a question for courts to analyze through the lens of "'traditional principles' of state law." *Arthur Andersen*, 556 U.S. at 631.

New York courts have recognized the right of a nonsignatory to enforce an arbitration agreement as a third-party beneficiary. *See Shapiro v. Sankarsingh*, 114 N.Y.S.3d 68, 69 (N.Y. App. Div. 2019) ("Although [a] defendant is not a signatory to [an] arbitration agreement . . ., [they] can still enforce it as a third-party beneficiary." (citing *Mendel v. Henry Phipps Plaza W., Inc.*, 844 N.E.2d 748, 751 (N.Y. 2006))). Under New York law, "[t]he touchstone of third-party beneficiary status is the intent of the parties to the agreement." *In re Generali COVID-19 Travel Ins. Litig.*, 577 F. Supp. 3d 284, 292 (S.D.N.Y. 2021) (citing *Port Auth. of N.Y. & N.J. v. Brooklyn Union Gas Co.*, 119 N.Y.S.3d 191, 194 (N.Y. App. Div. 2020)). The analysis primarily focuses on whether the contract's language demonstrates "that the contract was intended for

30

[the third party's] benefit." *Mendel*, 844 N.E.2d at 751 (quoting *Burns Jackson Miller Summit & Spitzer v. Lindner*, 451 N.E.2d 459, 469 (N.Y. 1983)).   Of course, "[e]xistence of a valid and binding contract is . . .a *sine qua non*"[12] of the third-party beneficiary analysis.   *Lindner*, 451 N.E.2d at 469 (internal citations omitted). However, as relevant here, the Court has recognized that there is a valid and binding arbitration agreement between Ms. Gluesing and CVS Specialty.

To "determine and give effect to" a contract's "purpose and intent," New York courts instruct that the language of a contract "must be read 'as a harmonious and integrated whole.'" *Port Auth. of N.Y. & N.J.*, 119 N.Y.S.3d at 194 (quoting *Nomura Home Equity Loan, Inc., Series 2006–FM2 v. Nomura Credit & Cap., Inc.*, 92 N.E.3d 743, 747 (N.Y. 2017)).   Here, two portions of CVS Specialty's Terms are relevant to the Court's analysis.   First, the Terms state at the very beginning that, "[b]y tapping or clicking 'I agree,' . . . or by using the Service . . ., you expressly agree to be bound by this Agreement," and "the Service" is defined as "any services or goods provided through or in connection with the Site or by CVS Caremark Specialty Pharmacy or one of its subsidiaries or affiliates." ECF No. 63-14 [Ex. D, Howell Decl.] at 2.  Second, in the "Dispute Resolution" portion, the Terms provide that: "All disputes arising out of or related to this Agreement or any aspect of the relationship between you, on the one hand, and CVS/Specialty or its suppliers or vendors, on the other hand, . . . will be resolved through final and binding arbitration[.]" *Id.* at 16.

---

[12] *Sine qua non* is a Latin phrase meaning "[a]n indispensable condition or thing; something on which something else necessarily depends." *Sine Qua Non*, Black's Law Dictionary (9th ed. 2009).

Though the words "affiliate" and "vendor" are undefined in CVS Specialty's Terms, courts in New York instruct that "[t]he words and phrases used in an agreement must be given their plain meaning so as to define the rights of the parties." *Mazzola v. Cnty. of Suffolk*, 533 N.Y.S.2d 297, 297 (N.Y. App. Div. 1988) (internal citations omitted). Indeed, "it is common practice . . . to refer to the dictionary to determine the plain and ordinary meaning of words to a contract." *Id.*

Turning to its dictionary definition, an "affiliate" is "[a] corporation that is related to another corporation by shareholdings or other means of control," and it is further defined as "a subsidiary, parent, or sibling corporation." *Affiliate*, Black's Law Dictionary (9th ed. 2009). Meanwhile, a "vendor" is defined as "[a] seller." *Vendor*, Black's Law Dictionary (9th ed. 2009). According to Defendants, Caremark qualifies as an "affiliate" and PrudentRx qualifies as a "vendor." ECF No. 63 at 21. Defendants thus argue that CVS Specialty's Terms were intended to benefit both entities. *Id.* The Court agrees.

First, as to Caremark, Ms. Gluesing acknowledges in her Complaint that "Caremark . . . operates a specialty pharmacy, commercially known as 'CVS Specialty Pharmacy.'" ECF No. 1 at 1, 7. That Caremark "operates" CVS Specialty necessarily means that it is a corporation exercising a "means of control" over CVS Specialty, thereby rendering it an "affiliate" of CVS Specialty. In addition, Ms. Gluesing concedes that Caremark is CVS Specialty's "indirect *parent*." ECF No. 66 at 24 (emphasis added). Ms. Gluesing argues that a "parent" somehow differs from an "affiliate," but the Court struggles to see how this is so considering that the two terms

32

are synonymous with one another.  *See Affiliate*, Black's Law Dictionary (9th ed. 2009).

As an affiliate, CVS Specialty's arbitration agreement is intended for Caremark's benefit.  Again, the arbitration agreement applies to "all disputes arising out of or related to this Agreement," and the Agreement explicitly reaches "any services or goods provided through or in connection with . . . one of [CVS Specialty's] . . . affiliates."  ECF No. 63-14 [Ex. D, Howell Decl.] at 2, 16.  This broad language expresses an intent to afford Caremark the right to enforce CVS Specialty's arbitration agreement.

Second, as to PrudentRx, Ms. Gluesing herself refers to PrudentRx (as well as Caremark, for that matter) as a "vendor[ ]" in her Complaint.  *See* ECF No. 1 at 6. Both parties also direct the Court's attention to a "Master Service Agreement," *see* ECF No. 66 at 26; ECF No. 75 at 20, which PrudentRx entered with "CVS Pharmacy, Inc. . . . on its own behalf and on behalf of [CVS Pharmacy, Inc.'s] subsidiaries and affiliates."  ECF No. 66-15 [Ex. 14] at 2.  The Master Service Agreement refers to CVS Pharmacy, Inc. and its subsidiaries and affiliates "individually and collectively" as "CVS."  ECF No. 66-15 [Ex. 14] at 2.  And as Defendants point out, CVS Specialty Pharmacy is an affiliate of CVS Pharmacy, Inc.  ECF No. 75 at 20 (citing ECF No. 66-14 [Ex. 13] at 2).

The Master Service Agreement also defines PrudentRx as a "Vendor," and it states that "CVS presently intends to *purchase* the Services from Vendor provided Vendor is providing the Services in a timely and consistent manner as described in

33

this Agreement." ECF No. 66-15 [Ex. 14] at 2 (emphasis added). It bears reemphasizing that CVS Specialty is encompassed in the definition of "CVS" in the Master Service Agreement, meaning that it too—as an affiliate of CVS Pharmacy, Inc.— "purchase[s] . . . [s]ervices" from PrudentRx. *Id.* at 2. This renders PrudentRx a "vendor" of CVS Specialty and, as relevant to the third-party beneficiary analysis, also demonstrates an intent to afford PrudentRx the right to enforce CVS Specialty's arbitration agreement.

In sum, the Court concludes that Caremark and PrudentRx—as CVS Specialty's respective "affiliate" and "vendor"—are entitled to enforce CVS Specialty's arbitration agreement against Ms. Gluesing as third-party beneficiaries.

## IV. CONCLUSION

For the reasons stated, Defendants' Renewed Motion to Compel Arbitration is GRANTED. ECF No. 63. In addition, as explained above, because the Court does not and need not rely on the evidence that forms the basis of Ms. Gluesing's Motion to Preclude and Strike Defendant Caremark's Undisclosed Evidence Under Rule 37(c)(1), that Motion is DENIED as moot. ECF No. 68.

"When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding." *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024); *see* 9 U.S.C. § 3. Defendants request such a stay here. ECF No. 63 at 3. Accordingly, this case will be STAYED pending arbitration. The parties are ORDERED to file a joint status report within 14 days of the conclusion of arbitration.

34

IT IS SO ORDERED.


*s/John J. McConnell, Jr.*


JOHN J. MCCONNELL, JR.
Chief Judge
United States District Court


July 7, 2026